**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 14-4049**

———————

UNITED STATES OF AMERICA,

              Plaintiff – Appellee,

    v.

CHARLES WILLIAMS, JR.,

              Defendant – Appellant.

———————

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. William L. Osteen, Jr., Chief District Judge; Thomas D. Schroeder, District Judge. (1:12-cr-00264-WO-1)

———————

Argued: September 16, 2015        Decided: December 14, 2015

———————

Before KING, KEENAN, and FLOYD, Circuit Judges.

———————

Vacated and remanded by published opinion. Judge King wrote the opinion, in which Judge Keenan and Judge Floyd joined.

———————

**ARGUED:** Amber Rae Will, COLLEGE OF WILLIAM & MARY, Williamsburg, Virginia, for Appellant. Terry Michael Meinecke, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Gregory Davis, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greensboro, North Carolina; Patricia E. Roberts, Brittany Sadler, Andrew L. Steinberg, WILLIAM & MARY SCHOOL OF LAW, Williamsburg, Virginia; Tillman J. Breckenridge, Thomas W. Ports, Jr., REED SMITH LLP, Washington, D.C., for Appellant. Ripley Rand, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

KING, Circuit Judge:

Charles Williams, Jr., was convicted and sentenced in the Middle District of North Carolina for possessing with intent to distribute crack cocaine. In this appeal, Williams pursues a single contention — that the district court erred by denying his motion to suppress evidence seized during a traffic stop on Interstate 85. During that stop, a deputy sheriff issued Williams a written warning, and Williams thereafter refused to consent to a vehicle search. The police then conducted a dog sniff of the car and seized crack cocaine from it. Williams maintains that extending the traffic stop for the dog sniff contravened the Fourth Amendment and that the crack cocaine should have been suppressed. As explained below, we vacate and remand.

I.

A.

While traveling by rental car through central North Carolina in the early hours of February 13, 2012, Williams and his girlfriend Elisabeth MacMullen were stopped for speeding by a deputy sheriff. After the deputy issued Williams a written warning and returned his documentation, another deputy conducted a dog sniff of the rental vehicle. The dog alerted, and the ensuing search revealed crack cocaine in the vehicle's trunk.

2

Williams and MacMullen (together, the "Defendants") were then arrested.

Five months thereafter, on July 30, 2012, the federal grand jury in Greensboro indicted the Defendants for possessing with intent to distribute crack cocaine, in violation of 21 U.S.C. § 841(a)(1). The Defendants moved separately to suppress the seized evidence and, on November 20, 2012, the district court conducted an evidentiary hearing (the "initial hearing"). At the initial hearing, the prosecution presented the testimony of the deputies, Justin Russell and Jerry Soles, as well as a video of the traffic stop that was recorded from Russell's patrol car (the "Russell Video"). By its December 11, 2012 memorandum opinion, the court denied the motions to suppress. See United States v. Williams, No. 1:12-cr-00264 (M.D.N.C. Dec. 11, 2012), ECF No. 27 (the "First Opinion").

About three months later, the government produced a second video of the traffic stop, which had been recorded from Deputy Soles's patrol car (the "Soles Video"). The Soles Video directly contradicted an important aspect of the prosecution's evidence at the initial hearing. The Defendants thus sought reconsideration of the suppression denial, asserting that the Soles Video undermined the First Opinion. On March 21, 2013, the court conducted a second evidentiary hearing (the "reconsideration hearing"). Deputies Russell and Soles again

3

testified and, on April 9, 2013, the court issued a new opinion, declining again to suppress the evidence. See United States v. Williams, No. 1:12-cr-00264 (M.D.N.C. Apr. 9, 2013), ECF No. 45 (the "Superseding Opinion").

On April 17, 2013, a jury convicted Williams of the offense charged, but acquitted MacMullen. On January 10, 2014, the district court sentenced Williams to eighty-four months in prison. Williams timely noticed this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

B.

1.

The pertinent facts are for the most part undisputed. As spelled out herein, they are drawn from the First Opinion, the Superseding Opinion, and other aspects of the record.

Deputies Russell and Soles were separately patrolling I-85 near Lexington, North Carolina, during the early hours of February 13, 2012. Just after midnight, Soles observed two cars speeding southbound and traveling close together. At about 12:37 a.m., Soles stopped the lead vehicle, driven by Williams's brother, and Russell stopped the second vehicle, a Hyundai rental car driven by Williams with MacMullen as the passenger.[1]

---

[1] The times of day specified with respect to the interactions of Williams with Deputies Russell and Soles are drawn from the time display on the Russell Video.

4

After stopping the Hyundai, Deputy Russell informed Williams that he was going 80 mph in a 70-mph zone and requested his driver's license and vehicle registration. Williams then provided a New York license and the rental agreement. The agreement reflected that MacMullen had rented the Hyundai from Hertz in Totowa, New Jersey, on February 10, 2012. According to the agreement, the car was to be returned there by 2:30 p.m. on February 13, 2012 (that afternoon). Russell requested that Williams exit the Hyundai and sit in his patrol car while he checked Williams's documents. Williams did so, and MacMullen remained in the Hyundai.

Inside the patrol car, Deputy Russell engaged Williams in conversation as the license check was conducted. Williams related that he and MacMullen had stopped at his mother's home in Virginia Beach and were traveling to Charlotte — about sixty miles southwest of the traffic stop on I-85 — to visit his brother for a couple of days. Russell thought he smelled alcohol and asked Williams if he had been drinking. In response, Williams said he had consumed a beer with supper. Russell then asked Deputy Soles, who had stopped the lead vehicle less than 100 yards away, to administer a breathalyzer test to Williams. As a result, Soles cut short his traffic stop of the lead vehicle, gave Williams's brother a verbal warning, and went to assist Russell. At approximately 12:45 a.m., Soles

5

moved his patrol car, containing the drug dog Dakota, to a point along the shoulder of I-85 behind Russell's patrol car. Arriving at Russell's patrol car, Soles greeted Williams through the open front-passenger-side window at about 12:46 a.m. Soles administered the breathalyzer test as Williams sat in Russell's patrol car.

Deputy Russell then approached the Hyundai to speak with MacMullen. Russell asked MacMullen about Williams's alcohol consumption and the couple's travel plans. She responded that Williams had had very little to drink and that they were on their way to Charlotte. Russell asked why they were going to Charlotte, and MacMullen responded, "I don't know, we are just on vacation." See First Opinion 4.

Back at Deputy Russell's patrol car, Deputy Soles continued to talk with Williams while awaiting the results of the breathalyzer test. Williams told Soles that he was on vacation and was going to visit his brother in Charlotte. He also told Soles that the driver of the lead vehicle was his brother and that the two vehicles were traveling together. At the initial hearing, Soles testified that Williams's statement contradicted

6

the driver of the lead vehicle, who had told Soles that "he wasn't traveling with anybody." See J.A. 75.[2]

When Deputy Russell returned to his patrol car, Deputy Soles informed him that Williams had passed the breathalyzer test. While Soles listened, Russell advised Williams that he had passed the test and would receive a written warning for speeding. When Russell requested an address from Williams to complete the written warning, Williams gave the post office box address of his place of employment in New York, which differed from the New York post office box address on his driver's license.

As Deputy Russell was writing the warning, Deputy Soles asked Williams where he lived. Williams responded that he lived in both New York and New Jersey and that he and MacMullen had a child and lived together. When Soles asked where they were headed, Williams said, "Charlotte." See First Opinion 4. In response to a question about their planned stay in Charlotte, Williams said that they would stay at a Wyndham hotel and that the length of their stay would depend on how his brother's wife acted. When Russell pointed out that the rental car was to be

---

[2] Our citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

returned in New Jersey that very afternoon, Williams said he would renew the rental agreement in Charlotte.

Deputy Russell completed the written warning and gave it to Williams at 12:54:59 a.m. Seconds later, as Williams was exiting the patrol car, Russell asked if he could pose a question. After Williams responded affirmatively, Russell asked, "Nothing illegal in the car?" See First Opinion 5. Williams responded that there was not. As Russell and Williams exited the patrol car, Russell persisted — again asking Williams if he could search the Hyundai — and Williams initially equivocated. Williams then walked towards the Hyundai, opened the rear-driver-side door, and gestured that the deputies could look inside. Deputy Soles then asked for a clear yes-or-no answer on whether Williams was consenting to a search of the Hyundai. Williams firmly replied, "[N]o." Id. at 7.

Immediately thereafter, at 12:56:22 a.m. — a minute and twenty-three seconds after Deputy Russell issued the written warning — Deputy Soles advised Williams to "hold on" and that a dog sniff would be conducted on the vehicle. See J.A. 130; First Opinion 7. As a result, MacMullen was removed from the car and Soles walked Dakota around it. Dakota alerted at the driver's side of the trunk after completing a full circle of the vehicle. The dog's alert was at 12:59:02 a.m. — two minutes and forty seconds after Soles instructed Williams to hold on so that

8

Soles could conduct the dog sniff. Crack cocaine was thereafter found and seized from an unlocked safe in the Hyundai's trunk.

2.

On December 11, 2012, the district court denied the Defendants' motions to suppress. By its First Opinion, the court explained that "the Government's argument for a finding of reasonable suspicion" rested on five specific factors:

- The Defendants were traveling "in a rental car";

- The Defendants were traveling "on a known drug corridor at 12:37 a.m.";

- "Williams' stated travel plans were inconsistent with, and would likely exceed, the due date for return of the rental car";

- "Williams was unable to provide a permanent home address in New York even though he claimed to live there at least part-time and had a New York driver's license"; and

- "Williams stated that he was traveling with the car ahead of him, yet that car's driver denied any association with Williams."

See First Opinion 23.[3] As an alternative ground for denying the suppression motions, the court ruled that the two-minute-and-forty-second extension for the dog sniff fell "within the

---

[3] The First Opinion spelled out in paragraph form the factors on which the district court predicated its suppression ruling. We have reformatted those factors into the five foregoing bullet points.

9

general parameters of a de minimis delay that does not offend the Fourth Amendment." Id. at 32.

In late February or early March of 2013 — almost three months after the First Opinion — the prosecution provided the Defendants with the Soles Video, which shows the traffic stop of the lead vehicle. The government explained that it had produced the Soles Video in a tardy fashion because it had only then realized that the stop of the lead vehicle might be relevant. The Soles Video was Brady material, however, and directly contradicted Deputy Soles's evidence at the initial hearing on the fifth factor identified in the First Opinion. As a result, the Defendants moved for reconsideration of the court's suppression denial.

3.

At the reconsideration hearing on March 21, 2013, the Defendants relied primarily on the Soles Video. The prosecutor, seeking to explain the evidentiary contradictions and sustain the suppression denial, again called both deputies to testify. Deputy Soles acknowledged that his testimony at the initial hearing — that Williams's brother had denied any association with Williams — was "wrong," and that he had "made a mistake." See J.A. 193. From the bench, the district court recognized Soles's earlier testimony as both "wrong" and "not true." See

10

id. at 252, 271. Deputy Russell simply reiterated his earlier testimony about stopping the Hyundai for speeding.

On April 9, 2013, the district court issued its Superseding Opinion. To the First Opinion's factual recitation, the Superseding Opinion added the following from the court's review of the Soles Video. Less than a minute after Deputy Soles radioed Deputy Russell for assistance, Soles stopped the lead vehicle for speeding.[4] Soles asked the driver if he was traveling with the car behind him (the Hyundai). Williams's brother responded, "[W]e together," contradicting what Soles had said at the initial hearing. See Superseding Opinion 11. Soles then instructed Williams's brother to sit in Soles's patrol car as he conducted a license check. During their conversation in the patrol car, Soles again asked Williams's brother who was traveling with him. Williams's brother responded, "That's my brother and his fiancée," which further contradicted Soles's prior testimony. See id. After issuing a verbal warning, Soles advised Williams's brother that he was free to go.

---

[4] The Superseding Opinion described the exchange that occurred between the deputies immediately prior to the traffic stop. Deputy Soles informed Deputy Russell by radio that he was observing two cars speeding southbound together. Russell responded that he would pull behind Soles, and Soles gave him the license plate information about the Hyundai. Soles then told Russell to "see if you can get a violation on your own, and if not we'll use one of mine." See Superseding Opinion 10. Russell responded, "[A]lright." Id.

11

Because Deputy Soles's discredited testimony was the basis for the First Opinion's fifth factor, the Superseding Opinion recited that "the Government's argument for a finding of reasonable suspicion" depended on only four of the five factors previously identified. See Superseding Opinion 31. The Superseding Opinion recited the four factors and again denied the suppression motions, concluding that those factors,

> when presented to a reasonable officer, provide reasonable, articulable suspicion that criminal activity may be afoot to justify [Deputy] Soles' limited detention for the purpose of deploying the drug dog, which was already on the scene.

Id. at 32. The court again ruled, in the alternative, that the "dog sniff [fell] within the general parameters of a de minimis delay that does not offend the Fourth Amendment." Id. at 40.

II.

A district court's ultimate determination of a reasonable-suspicion question is assessed de novo. See United States v. Arvizu, 534 U.S. 266, 275 (2002); Ornelas v. United States, 517 U.S. 690, 699 (1996). Absent clear error, however, we will not disturb factual findings made by a district court after an evidentiary hearing on suppression issues. See United States v. Dire, 680 F.3d 446, 473 (4th Cir. 2012). When a district court has denied a motion to suppress, we view the evidence in the

12

light most favorable to the government.  See United States v. Watson, 703 F.3d 684, 689 (4th Cir. 2013).

## III.

On appeal, Williams reiterates his contention that the deputies lacked the reasonable suspicion necessary to extend the traffic stop beyond its initial purpose.[5]  As the Supreme Court made clear in Illinois v. Wardlow, an officer must possess "a reasonable, articulable suspicion that criminal activity is afoot" to execute a brief "investigatory detention."  See 528 U.S. 119, 123 (2000).

The government now concedes that the de minimis ground for denying the suppression motions is legally untenable.  As a result, the prosecutors recognize that their only viable

---

[5] The Superseding Opinion specified that the district court would focus only on Deputy Soles's knowledge in its reasonable-suspicion inquiry because Soles had "decided to conduct the drug dog sniff on his own order, and there is no evidence that Deputy Russell did so or participated in the decision."  See Superseding Opinion 19.  For that proposition, the court relied on our explanation in United States v. Massenburg that "the collective knowledge doctrine 'does not permit [a court] to aggregate bits and pieces of information from among myriad officers.'"  Id. (quoting Massenburg, 654 F.3d 480, 493 (4th Cir. 2011)).  On appeal, however, Williams and the government both frame the issue in terms of whether the deputies together had reasonable suspicion.  We accept the parties' articulation, but observe that — on this record — it matters not whether we look only to Soles's knowledge or to the two deputies' knowledge collectively.

contention is that the district court correctly ruled that — on this record — reasonable, articulable suspicion justified the dog sniff of the Hyundai. To that end, they rely solely on the factors identified by the court in the Superseding Opinion.

A.

1.

Before evaluating the reasonable-suspicion contention, we identify some pertinent legal principles that bear on its resolution. A traffic stop constitutes a "seizure" under the Fourth Amendment and is thus subject to a reasonableness requirement. See Whren v. United States, 517 U.S. 806, 810 (1996). Because a traffic stop is more akin to an investigative detention than a custodial arrest, we analyze the constitutionality of such a stop under the two-prong standard enunciated in Terry v. Ohio, 392 U.S. 1 (1968). See Arizona v. Johnson, 555 U.S. 323, 330-31 (2009). Pursuant thereto, we first determine whether the officer's reason for the traffic stop was legitimate. See United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992). Second, we examine whether the officer's actions during the seizure were "reasonably related in scope" to the basis for the traffic stop. Id. (internal quotation marks omitted).

In April of this year — while this appeal was pending — the Supreme Court decided Rodriguez v. United States, 135 S. Ct.

14

1609 (2015). Rodriguez held that, absent reasonable, articulable suspicion of criminal activity, a detaining officer may not extend an otherwise-completed traffic stop in order to conduct a dog sniff. See id. at 1614-16. The Court emphasized that, under Terry's second prong, the "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are — or reasonably should have been — completed." Id. at 1614. In other words, to extend the detention of a motorist beyond the time necessary to accomplish a traffic stop's purpose, the authorities must either possess "reasonable suspicion or receive the driver's consent." See United States v. Digiovanni, 650 F.3d 498, 507 (4th Cir. 2011); United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008).

2.

With respect to Terry's first prong — whether the reason for the traffic stop was legitimate — Williams does not dispute that Deputy Russell was entitled to stop the Hyundai for speeding. On Terry's second prong — whether the officers' actions were reasonably related in scope to the basis for the traffic stop — it is similarly undisputed that Russell had accomplished the purpose of the stop before Deputy Soles decided to conduct the dog sniff of the Hyundai. Furthermore, Williams did not consent to a search of the vehicle. Thus, the propriety of extending Williams's detention beyond the completion of the

15

traffic stop turns on whether reasonable, articulable suspicion existed when Soles decided to conduct a dog sniff of the Hyundai.

Reasonable suspicion is a "commonsense, nontechnical" standard that relies on the judgment of experienced law enforcement officers, "not legal technicians." See Ornelas v. United States, 517 U.S. 690, 695 (1996) (internal quotation marks omitted). To support a finding of reasonable suspicion, we require the detaining officer "to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." See United States v. Foster, 634 F.3d 243, 248 (4th Cir. 2011).

Under the applicable principles, the relevant facts articulated by the officers and found by the trial court, after an appropriate hearing, must "in their totality serve to eliminate a substantial portion of innocent travelers." See United States v. McCoy, 513 F.3d 405, 413 (4th Cir. 2008). As our McCoy decision explained, however, each articulated fact need not "on its own eliminate every innocent traveler." Id. Rather, we "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal

16

wrongdoing." See United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted).

B.

With this framework in mind, we briefly address the de minimis contention and then turn to a comprehensive analysis of the reasonable-suspicion question. The prosecution contended in both hearings in the district court that the officers' nearly three-minute extension of Williams's detention — after completion of the traffic stop — was for a constitutionally permissible de minimis period of time. In each of its opinions, the district court agreed with that proposition. In so ruling, each opinion relied on our decision in United States v. Farrior, where we recognized that a de minimis extension of the traffic stop — during which an officer conducted a dog sniff of Farrior's vehicle — was not "a violation of [Farrior's] Fourth Amendment rights," regardless of whether the officer possessed reasonable suspicion. See 535 F.3d 210, 220 (4th Cir. 2008). As the government now properly concedes, Rodriguez forecloses the de minimis ground.

In rejecting the "de minimis rule" for a dog sniff conducted after a completed traffic stop, the Rodriguez Court distinguished those practices directed towards ensuring "[h]ighway and officer safety" — such as checking drivers' licenses for outstanding warrants — from those animated by "the

17

Government's endeavor to detect crime in general or drug trafficking in particular" — such as conducting a dog sniff for evidence of narcotics.  See 135 S. Ct. at 1615-16.  Put simply, the possibility that a dog sniff might reveal drug possession is not — absent a showing of reasonable, articulable suspicion — a valid basis for extending a traffic stop.  Cf. id. at 1615 ("Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission.").

C.

We thus turn to the dispositive issue in this appeal: whether, on this record, Deputies Russell and Soles had the reasonable, articulable suspicion of criminal activity necessary to extend the traffic stop and conduct the dog sniff of the Hyundai.  The district court, for its part, acknowledged that reasonable suspicion "must rest" on four factors:

- The Defendants were traveling "in a rental car";

- The Defendants were traveling "on a known drug corridor at 12:37 a.m.";

- "Williams' stated travel plans were inconsistent with, and would likely exceed, the due date for return of the rental car"; and

- "Williams was unable to provide a permanent home address in New York even though he claimed to live there at least part-time and had a New York driver's license."

18

See Superseding Opinion 31. We evaluate those factors both separately and in the aggregate, recognizing that our inquiry must account for the "totality of the circumstances," rather than employ a "divide-and-conquer analysis." See Arvizu, 534 U.S. at 274.

1.

a.

The first factor identified in the Superseding Opinion — the Defendants' use of a rental car — is of minimal value to the reasonable-suspicion evaluation. Neither Deputy Russell nor Deputy Soles explained any connection between use of a rental car and criminal activity. We will nevertheless accept that, as a general proposition, some drug traffickers use rental cars. See, e.g., United States v. Finke, 85 F.3d 1275, 1277 (7th Cir. 1996) (noting that officer was concerned about rental car because he knew "drug couriers often used rental cars to avoid asset forfeiture laws"); United States v. Thomas, 913 F.2d 1111, 1116 (4th Cir. 1990) ("[I]llegal transport of drugs often involves the use of rental cars traveling from source cities such as Miami."). It is similarly beyond peradventure, however, that the overwhelming majority of rental car drivers on our nation's highways are innocent travelers with entirely legitimate purposes.

19

b.

The second factor relied on in the Superseding Opinion —
that the Defendants were traveling "on a known drug corridor at
12:37 a.m." — is the only factor that, on its face, makes any
reference to criminal activity. Similar to traveling in a
rental car, however, the number of persons using the interstate
highways as drug corridors pales in comparison to the number of
innocent travelers on those roads. Furthermore, we are not
persuaded by the proposition that traveling south on I-85 late
at night helps narrow the identification of travelers to those
involved in drug activity.

i.

Undoubtedly, many drug traffickers use interstate highways
such as I-85, but so do many more innocent motorists. Put
simply, the interstate highways are the most efficient way to
drive between two points in this country, particularly large
cities. Thus, although we have recognized that law enforcement
officers and the trial courts are entitled to consider a
motorist's use of an interstate highway as a factor in
determining reasonable suspicion, we are entirely satisfied that
such an observation, standing alone, is entitled to very little
weight. See, e.g., Digiovanni, 650 F.3d at 512-13; accord
United States v. Santos, 403 F.3d 1120, 1132 (10th Cir. 2005)
(observing that prosecution had acknowledged that travel between

20

known drug source and known drug destination was weak factor in reasonable-suspicion analysis).

Because there is nothing inherently suspicious about driving at night on an interstate highway, police officers must rely on their training and experience to link interstate-highway travel to more specific characteristics of narcotics trafficking. See, e.g., United States v. Brugal, 209 F.3d 353, 359-60 (4th Cir. 2000) (en banc) (plurality opinion) (observing that officer "testified that, based on his knowledge and experience, drug couriers fly to Miami from a northern destination, such as New York, to obtain drugs, rent a vehicle, and return north with the drugs"); United States v. Foreman, 369 F.3d 776, 784-85 (4th Cir. 2004) (explaining that officer's experience with drug interdiction showed that particular highway was regular corridor for illegal drugs from New York City area to Tidewater Virginia). Deputies Russell and Soles, however, offered no evidence in either of the suppression hearings linking travel on an interstate highway with drug trafficking.[6]

---

[6] At trial, Deputy Soles identified the New York City area as a "source city" for narcotics trafficking. See J.A. 452. He conceded, however, that "any big city [could] be considered a source city." Id. at 457. The Superseding Opinion did not identify New York as a source city.

21

ii.

There is simply no basis on this record for assigning some nefarious significance to the 12:37 a.m. time of the traffic stop. Neither Deputy Russell nor Deputy Soles asserted that drug traffickers have some disproportionate tendency to travel on the interstate highways late at night. Nor is there support for the proposition that nighttime travel — alone or in combination with other factors identified in the Superseding Opinion — is an indicator of drug trafficking.

Due to the fact-specific nature of the reasonable-suspicion inquiry, see United States v. Demoss, 279 F.3d 632, 636 (8th Cir. 2002), it would be inappropriate for us to peruse appellate decisions for connections that Deputies Russell and Soles failed to draw. As we observed in Branch, "context matters" in the reasonable-suspicion inquiry because "actions that may appear innocuous at a certain time or in a certain place may very well serve as a harbinger of criminal activity under different circumstances." See 537 F.3d at 336. It follows that a determination that a certain fact is suspicious in one case does not compel the conclusion that the same fact is suspicious in other cases. See, e.g., United States v. Richardson, 385 F.3d 625, 630 (6th Cir. 2004) (recognizing that, although nervousness has sometimes been utilized in finding reasonable suspicion, "it

22

is an unreliable indicator, especially in the context of a traffic stop").

The Superseding Opinion relied on two Tenth Circuit decisions in deeming the midnight hour of the traffic stop a relevant factor in its reasonable-suspicion analysis. See United States v. Clarkson, 551 F.3d 1196 (10th Cir. 2009); Gallegos v. City of Colo. Springs, 114 F.3d 1024 (10th Cir. 1997). Our examination of those cases illustrates the problem with relying mainly on court decisions, as opposed to testimony from officers in the particular case, to identify certain facts as suspicious. First, the Clarkson decision involved a late-night stop of a vehicle that the police had just seen parked in front of a house that was under surveillance for suspected drug dealing, violent crime, prostitution, and gang activity. See 551 F.3d at 1198. After stopping the vehicle, an officer observed that the passenger appeared to be under the influence of narcotics. Id. at 1199. Second, in the Gallegos case, police officers had responded to calls reporting a "prowler" and an inebriated man arguing with a woman. See 114 F.3d at 1029. Those officers then observed Gallegos, who reeked of alcohol and was "acting in a very unusual fashion." Id.

In each of those decisions, the Tenth Circuit relied on the nighttime hour as one of several factors that — taken together — established reasonable, articulable suspicion of ongoing

23

criminal activity. See Clarkson, 551 F.3d at 1202; Gallegos, 114 F.3d at 1029. We agree that street crime and public drunkenness are plainly more prevalent at night than during the day. By contrast, it is far from self-evident that interstate trafficking of drugs or other contraband is more common at night. This record does not make an evidentiary connection between nocturnal travel and drug trafficking, either alone or in combination with the other factors identified in the Superseding Opinion. Absent such a connection, that the traffic stop of Williams occurred at about 12:37 a.m. does not contribute to a reasonable, articulable suspicion for extending the otherwise-completed traffic stop to conduct a dog sniff.

c.

The Superseding Opinion's analysis of its third factor focused on what the district court characterized as the "inconsisten[cy]" between Williams's travel plans and the due date for return of the rented Hyundai. Williams had advised the deputies that he and his girlfriend were planning to stay in Charlotte for a few days, but the rental agreement reflected that the Hyundai was due to be returned that afternoon in New Jersey. Williams also said that he would extend the rental agreement when he arrived in Charlotte. We therefore assess how the expiring rental agreement, and Williams's explanation of it, impact the reasonable-suspicion analysis.

24

In the Tenth Circuit's Santos decision, the defendant had "rented a car in California on January 10, was in Wyoming on January 13, and proposed to drive to New York and back despite a January 17 'due date' in his rental agreement for returning the car to California." See 403 F.3d at 1129. The court of appeals agreed that "[i]mplausible travel plans can contribute to reasonable suspicion," but prudently emphasized that the prosecution had "presented no evidence that extending the car rental period would entail any financial penalty, or even any increase in the rate." Id. (footnote omitted). "Common experience suggests," the Santos decision recognized, that law-abiding rental car users frequently "extend the rental without incurring a penalty or paying a higher rate." Id. The Superseding Opinion similarly acknowledged that "[t]here are certainly a 'large number of innocent travelers who extend their trips beyond the time originally provided for in their rental agreements.'" See Superseding Opinion 25-26 (quoting United States v. Boyce, 351 F.3d 1102, 1110 n.6 (11th Cir. 2003)). We agree with that proposition. Put simply, planning to extend a rental agreement "may suggest that the driver's travel plans are uncertain or subject to change, but, without more, not that they are implausible." See Santos, 403 F.3d at 1129.

Mindful that innocent travelers frequently extend rental agreements, we turn to the record in this case. Deputy Soles

25

did not mention the rental agreement at either hearing. Deputy Russell testified at the initial hearing that the Hyundai was "due back [in New Jersey] that same day, and [Williams] was traveling away from there. That seemed odd to me." J.A. 39. As in Santos, Russell failed to explain how the rental car's due date was suspicious. When Russell mentioned to Williams that the Hyundai was due in New Jersey later that day, Williams replied promptly that he and MacMullen would renew the rental agreement in Charlotte. Cf. United States v. McRae, 81 F.3d 1528, 1535 (10th Cir. 1996) (noting that McRae's "evident lack of concern," "unusually cavalier attitude," and "vague response" regarding how he would return his rental car "correctly contributed to a reasonable suspicion in a trained and experienced officer"). Moreover, as Russell knew during the traffic stop, the Hyundai had been rented through Hertz, a well-known car rental business with locations most everywhere.

We do not doubt that the third factor, if it had been "keyed to other compelling suspicious behavior," might contribute to an experienced officer's reasonable suspicion. See Digiovanni, 650 F.3d at 513. But no reasonable, articulable suspicion of criminality arises from the mere fact that Williams's travel plans were likely to exceed the initial duration of the rental agreement.

d.

The Superseding Opinion's fourth factor specified that "Williams was unable to provide a permanent home address in New York even though he claimed to live there at least part-time and had a New York driver's license." That assertion, however, does not fully describe what occurred during the traffic stop. Although the district court related that Williams had failed to provide either Deputy Russell or Deputy Soles with his home address, the record shows that neither deputy asked Williams for it.

Distilled from the Superseding Opinion's unwarranted inference that Williams was unable to provide a home address, the fourth factor has three aspects: (1) when asked for an address, Williams gave a post office box address; (2) the address Williams provided differed from the address on his driver's license; and (3) Williams told the deputies that he lived in both New York and New Jersey. Neither Deputy Russell nor Deputy Soles explained how using a post office box address, or living in New York and New Jersey, raised some suspicion of criminal activity. In fact, neither officer identified any aspect of the fourth factor as suspicious. Although it is somewhat ambiguous, the only evidence regarding the significance of the post office box address suggests that the address did not raise suspicion. In response to a question on whether the post

27

office box address "affect[ed] [Russell] in the performance of [his] duties to issue a warning ticket," Russell said, "I put [the post office box address] there because I could not get [Williams's] formal address. That's where he received mail, so I still wrote that for the warning. . . . It didn't affect. It was just obscure." J.A. 54.

Despite the deputies' failure to draw any suspicion from Williams's post office box address, the district court hypothesized that the "different addresses and [the] explanations" Williams gave for them "may have legitimately raised suspicion." See Superseding Opinion 22 (emphasis added). In connecting Williams's use of a post office box address with possible suspicion, the court relied on our unpublished decision in United States v. Newland, 246 F. App'x 180 (4th Cir. 2007).

As with the second factor, cherry-picking "relevant factor" findings from inapposite factual contexts bears little fruit. Newland had furnished a driver's license from the U.S. Virgin Islands and a rental agreement in his name with a Maryland address, but advised the officers that he lived in Washington, D.C. See Newland, 246 F. App'x at 182-83, 189. The officers suspected immediately — and correctly — that the Virgin Islands license was fraudulent. Id. at 182-83. Newland was also visibly nervous, and when asked why he had used the Maryland address on the rental agreement, he "hesitated" before

28

explaining that the address was his girlfriend's. Id. at 182, 189. In those circumstances, we concluded that three different addresses — including one on a fake driver's license — reasonably aroused the officers' suspicion. Id. at 189. Moreover, at the suppression hearing, the officers "described in some detail the reasons for their suspicions about Mr. Newland's license." Id. at 188. Nothing in Newland suggests, however, that receiving mail at a different address from that shown on the recipient's driver's license provides a reasonable basis for suspicion.

Put succinctly, Deputies Russell and Soles failed to develop the fourth factor with Williams during the traffic stop and offered no explanation of how that factor contributed to any reasonable suspicion. Absent some factual underpinning, the significance of the fourth factor collapses.

2.

As explained above, each of the factors relied on in the Superseding Opinion — standing alone — fails to support any reasonable, articulable suspicion of criminal activity. That analysis does not end our inquiry, however, because, as we have recognized, "reasonable suspicion may exist even if each fact standing alone is susceptible to an innocent explanation." See McCoy, 513 F.3d at 413-14. Under the applicable standard, the facts, "in their totality," should "eliminate a substantial

29

portion of innocent travelers." Id. at 413. Furthermore, an officer must "either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." See Foster, 634 F.3d at 248.

a.

According to the Superseding Opinion, reasonable suspicion existed because the four factors, "taken together[,] . . . eliminate a substantial portion of innocent travelers." See Superseding Opinion 31. In pressing the contrary conclusion, Williams relies on our decision in Digiovanni. There, we rejected the government's appeal and affirmed a suppression ruling based on a Fourth Amendment violation. The officer in Digiovanni sought to rely on ten factors, including some that are similar to those in the Superseding Opinion. For example, Digiovanni was driving a rental car on I-95, which was characterized as "a known drug corridor." See 650 F.3d at 512-13. When asked about his travel itinerary, Digiovanni described an "unusual" route that included various stops to visit family members. Id. at 502-03, 512-13.

To be fair, Digiovanni's plan to ride the "Auto Train" for part of his trip, which would have temporarily separated him from his vehicle, "cut[] against the government's argument" for

30

reasonable suspicion. See Digiovanni, 650 F.3d at 513. Of importance, however, the officer specified two other factors that — in context — were relevant to the reasonable-suspicion analysis. First, Digiovanni had flown one-way into Florida — "a known drug source state" — and rented a car for the return trip to the northeast. Id. at 512-13. Second, "Digiovanni's hands were trembling when he handed over his driver's license and the rental [car] contract." Id. at 512. Our Digiovanni decision observed that the officer was "entitled to rely to some degree" on those two factors, in addition to others. Id. at 512-13. Nonetheless, Judge Hamilton concluded that "reasonable suspicion was not present to turn [Digiovanni's] routine traffic stop into a drug investigation." Id. at 513. At bottom, all the authorities could "link to the unusual travel itinerary" was that "Digiovanni rented a car from a source state, was stopped on I-95, and was initially nervous." Id.

Our Digiovanni decision is consistent with the Eleventh Circuit's decision in Boyce. In that case, the court evaluated circumstances that are materially indistinguishable from the first three factors relied on in the Superseding Opinion: Boyce was "driving a rental car on a known drug corridor [I-95]," and "planning to return the car two days late," that is, his stated travel plans exceeded the duration of the rental agreement. See

31

351 F.3d at 1109.[7]   The Eleventh Circuit ruled that those factors, in their totality, were insufficient to create reasonable suspicion because they "would likely apply to a considerable number of those traveling for perfectly legitimate purposes."  Id. (internal quotation marks omitted).

Neither Digiovanni nor Boyce dealt with the fourth factor specified in the Superseding Opinion — dual residency and differing addresses.  On this record, however, that factor does not tip the balance.  It is not atypical for a person to receive mail at an address other than the one on his driver's license, nor is it uncommon for a person to receive mail at his employer's address.  And many businesses receive their mail at post office box addresses — one need only leaf through the nearest magazine or journal for a subscription insert.  Finally, the fact that Williams was splitting time between residences in New York and New Jersey is unremarkable.

Stated simply, the Superseding Opinion's four factors — in the aggregate — fail to eliminate a substantial portion of innocent travelers.  Because the applicable standard requires

---

[7] A police officer stopped Boyce on I-95 shortly before midnight.  See Boyce, 351 F.3d at 1104.  In its reasonable-suspicion analysis, the Eleventh Circuit did not rely on the late hour of the traffic stop.

32

such a showing, the government's contention fails to pass constitutional muster.[8]

b.

Even if the Superseding Opinion's four factors were to eliminate a substantial portion of innocent travelers, Williams would yet prevail. The deputies neither articulated how Williams's particular behavior was suspicious nor logically demonstrated that his behavior was indicative of some more sinister activity than appeared at first glance, as our Foster decision requires.

It is well settled that, in the reasonable-suspicion inquiry, we "credit the practical experience of officers who observe on a daily basis what transpires on the street." See Branch, 537 F.3d at 336-37 (internal quotation marks omitted). Nevertheless, officers must apply their experience so that the courts can make informed decisions on whether their suspicions are reasonable. See Foster, 634 F.3d at 248 (explaining that

---

[8] We observe that the First Opinion's discarded fifth factor — "Williams stated that he was traveling with the car ahead of him, yet that car's driver denied any association with Williams" — supported the presence of reasonable suspicion in this case. See First Opinion 23. That factor, however, was entirely undermined by the Soles Video and the evidence at the reconsideration hearing. Indeed, the trial court characterized Deputy Soles's earlier testimony with respect to the fifth factor as "not true." See J.A. 271. If the fifth factor were viable, our conclusion today might well be different.

"an officer and the Government must do more than simply label a behavior as 'suspicious' to make it so"). Were it otherwise, an experienced police officer's recitation of some facts, followed simply by a legal catchphrase, would allow the infringement of individual rights with impunity. See Digiovanni, 650 F.3d at 512 (cautioning against "the inclination of the Government toward using whatever facts are present, no matter how innocent, as indicia of suspicious activity" (internal quotation marks omitted)). Put simply, our precedent requires that the authorities articulate or logically demonstrate a connection between the relevant facts and criminal activity. See Foster, 634 F.3d at 248.

This record fails to show how the four factors — separately or cumulatively — reasonably pointed to criminal activity. At the initial hearing, Deputy Soles testified generally that, prior to ordering the dog sniff, "I had already kn[own] and seen for myself indicators commonly associated with those that are involved in criminal activity." See J.A. 86. He later explained, in a conclusory fashion, that officers may "ask for consent to search" or "conduct a K-9 scan" when "we see indicators commonly associated with those that are involved in criminal activity, and[,] due to the totality of those circumstances that we see during that stop[,] [we believe] that criminal activity may be afoot." See id. at 92. Deputy Russell

34

testified in the reconsideration hearing that the factors mentioned in his police report "drew [his] suspicion," but he did not identify those factors or further elaborate on how they were connected to criminal activity. See id. at 227-28. We do not question the experience of these officers, but the prosecution is obliged to present evidence articulating reasonable suspicion.

Having assessed de novo the reasonable-suspicion question, we are simply not convinced that Deputies Russell and Soles possessed a reasonable, articulable suspicion of criminal activity during the traffic stop. Extending the otherwise-completed stop of the Hyundai to conduct a dog sniff thus contravened the Fourth Amendment.

IV.

Pursuant to the foregoing, we vacate Williams's conviction and sentence and remand for such other and further proceedings as may be appropriate.

VACATED AND REMANDED

35