**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-4212**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

DARREN HILL,

Defendant – Appellant.

**No. 15-4223**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

LLOYD DODWELL,

Defendant – Appellant.

Appeals from the United States District Court for the Western District of North Carolina, at Asheville. Martin K. Reidinger, District Judge. (1:12-cr-00093-MR-DLH-2; 1:12-cr-00093-MR-DLH-1)

Argued: January 24, 2017                    Decided: February 23, 2017

Before MOTZ, DUNCAN, and HARRIS, Circuit Judges.

_____

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Motz and Judge Harris joined.

_____

**ARGUED**: Paul Frederick Herzog, PAUL F. HERZOG, PA, Fayetteville, North Carolina; Randolph Marshall Lee, Charlotte, North Carolina, for Appellants. Anthony Joseph Enright, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF**: Jill Westmoreland Rose, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

_____

DUNCAN, Circuit Judge:

Defendants-Appellants Darren Hill ("Hill") and Lloyd Dodwell ("Dodwell") (collectively, "Defendants") appeal the district court's denial of their motions to suppress. For the reasons that follow, we affirm.

I.

A.

This appeal arises out of a traffic stop executed by Henderson County, North Carolina Sheriff's Deputy David McMurray ("Deputy McMurray").[1] On May 2, 2012, Deputy McMurray was patrolling Interstate 26 in Henderson County when he observed two vehicles traveling without the appropriate distance between them. Deputy McMurray activated his blue lights and pulled over the second vehicle, a Chevrolet Equinox SUV ("SUV"), for following too closely.[2]

Deputy McMurray approached the stopped SUV from the passenger's side. Dodwell was in the driver's seat and Hill was in the passenger's seat. After Deputy McMurray explained the stop, Dodwell admitted to following too closely. Deputy McMurray asked Dodwell to exit the SUV and accompany him to his patrol car so he

---

[1] Prior to his employment with Henderson County, Deputy McMurray served nine years as a canine handler with the North Carolina Highway Patrol.

[2] Deputy McMurray's unmarked patrol car was outfitted with a system that begins recording the interior of the car (audio/video) and the events transpiring in front of the car (video only) when an officer activates his blue lights. Deputy McMurray was also wearing a body microphone, which records audio when Deputy McMurray is outside of the patrol car.

could issue a warning ticket. Deputy McMurray also asked Hill for a form of identification, but Hill responded that he did not have any with him. Deputy McMurray frisked Dodwell for weapons and escorted him to the patrol car. Hill remained in the SUV.

Deputy McMurray instructed Dodwell to take a seat in the front of the patrol car. In the patrol car, Deputy McMurray began the process of entering the ticket information and verifying Dodwell's documentation. As he input information and waited for results, Deputy McMurray engaged Dodwell in conversation. Some of Deputy McMurray's questions pertained to the stop and others ranged far afield, covering such topics as Dodwell's travel plans and recent activities. During this roughly nine-minute conversation, Deputy McMurray became suspicious of a number of Dodwell's answers. Dodwell acknowledged that he had previously been arrested for drugs and that he did not own the SUV--it belonged to either Hill's girlfriend or sister.

Deputy McMurray tried to run a records check on Hill, but needed additional information. After explaining his departure to Dodwell, Deputy McMurray went to the SUV to ask Hill his birthdate, obtain the SUV's vehicle identification number to complete his paperwork, and return the vehicle registration to Hill. Approximately fourteen minutes had elapsed from the initiation of the traffic stop.

Deputy McMurray spoke with Hill for two minutes, during which time Hill made several statements that conflicted with statements Dodwell had made earlier. When Deputy McMurray returned to his car, he entered more data for the ticket and continued to speak with Dodwell. During the approximately two minutes required to print the

4

warning ticket, Dodwell made statements conflicting with information Hill had just provided. As he later testified, Deputy McMurray became concerned that criminal activity was afoot because of (1) the ambiguity surrounding ownership of the vehicle, (2) the contradictory answers given by Hill and Dodwell, (3) both Defendants' evasive and nervous behavior, and (4) the fact that Defendants were traveling from Atlanta--"the largest source of narcotics on the east coast," J.A. 101--in a type of vehicle commonly used for drug trafficking.

Deputy McMurray gave Dodwell his license and warning ticket about seventeen minutes after initiating the stop. "Before Dodwell opened the patrol car door to leave, Deputy McMurray asked Dodwell, 'do you mind talking to me for just a minute?'" J.A. 143–44; Gov't Exhibit Five ("GX5") at 00:17:56. Dodwell agreed, and Deputy McMurray further questioned him about the inconsistencies between his and Hill's stories. Deputy McMurray also asked Dodwell if there was cocaine or "weed" in the car, to which Dodwell replied there was not. J.A. 103.

Deputy McMurray exited the car and obtained Hill's consent to engage in further conversation. Deputy McMurray asked Hill for consent to search the car, and Hill directed Deputy McMurray to ask Dodwell for permission. Returning to his patrol car, Deputy McMurray alerted Dodwell to another inconsistency between Dodwell's and Hill's stories, and then asked for consent to search the car: "Now look, hear me out? Okay? I'd like to search the car. Will you give me permission to search it? He's [Hill] already said he ain't got no control over the car? That it's up to you." GX5 at 00:24:55–00:25:10; J.A. 104. Dodwell refused, restating that the vehicle was not his.

5

Deputy McMurray then notified Dodwell that he was going to call for another deputy so he could run his drug-detection dog Kira around the SUV. Deputy McMurray explained to Dodwell that he would search the vehicle if Kira alerted, but would not search if the dog did not alert. Dodwell replied that this was fine with him. Deputy McMurray radioed for backup and asked for consent to move the SUV to a safer location, which Dodwell refused.

When backup arrived, thirty-three minutes and seven seconds had elapsed since the initiation of the traffic stop. Deputy McMurray then asked Hill to exit the SUV and frisked Hill. After moving Hill away from the SUV, Deputy McMurray deployed Kira to sniff around the SUV. "On three occasions, while Deputy McMurray and Kira were circling the SUV, Kira pulled Deputy McMurray in the direction of Hill's path that led away from the SUV." J.A. 144. "At the time, Deputy McMurray did not recognize that Kira was alerting to Hill." J.A. 106.

Kira also alerted to the SUV's passenger door on multiple trips around the SUV. On the third trip, Kira jumped through the open passenger door window, which Deputy McMurray interpreted as an alert to the odor of narcotics. Deputy McMurray then put Kira back in the patrol car and began searching the vehicle. The search revealed over $30,000 of bundled United States currency, which Deputy McMurray believed to be drug proceeds.

After discovering the money, Deputy McMurray handcuffed Defendants before continuing the search. "At various times during the search of the SUV, Dodwell and Hill were placed in Deputy McMurray's patrol car, sometimes together sometime[s]

6

individually, as law enforcement officers continued searching the SUV." J.A. 144. During the search, another officer on the scene read Defendants their *Miranda* rights and each Defendant consented to questioning. The rest of the search revealed no contraband in the SUV, so Deputy McMurray released Defendants.

Ten days later, while reviewing the recording of the stop, Deputy McMurray saw that a handcuffed Hill had deposited a bag behind the patrol car's driver seat. Deputy McMurray investigated and discovered a plastic bag containing cocaine hydrochloride.

B.

A grand jury indicted Defendants for possession with intent to distribute at least 500 grams of cocaine in violation of 21 U.S.C. § 841(a)(1). Both Defendants filed a motion to suppress, which the magistrate joined for hearing. After the hearing, the magistrate recommended that the district court deny Defendants' motions to suppress. Defendants generally objected to the magistrate's memorandum and recommendation ("M&R") on the grounds that the traffic stop violated the Fourth Amendment. The district court accepted the M&R, and denied Defendants' motions to suppress in full. The district court explained that (1) Deputy McMurray did not unreasonably extend the traffic stop prior to issuing the ticket, and (2) Deputy McMurray's post-ticket extension found justification in both reasonable suspicion and Defendants' consent. The district court also noted that neither Defendant objected to the M&R's conclusions concerning post-ticket events. Both Defendants pleaded guilty to one count of possession with intent to distribute, conditioned on their right to appeal the denial of their motions to suppress.

## II.

On appeal, drawing on precedent decided since the stop--*Rodriguez v. United States*, 135 S. Ct. 1609 (2015), and *United States v. Williams*, 808 F.3d 238 (4th Cir. 2015)--Defendants argue that Deputy McMurray impermissibly extended the traffic stop both before and after issuing a warning ticket. The government counters that any de minimis pre-ticket delay was allowed under governing precedent at the time of the stop, and Defendants waived their right to challenge the reasonableness of the post-ticket extension by failing to sufficiently object on that ground below. Alternatively, the government maintains that Defendants' consent and Deputy McMurray's reasonable suspicion justified the post-ticket extension.

"In considering the appeal of a denial of a motion to suppress, we review the district court's legal conclusions de novo and its factual findings for clear error." *United States v. Slocumb*, 804 F.3d 677, 681 (4th Cir. 2015). "We further construe the evidence in the light most favorable to the government--the prevailing party below." *Id.* For the reasons that follow, we affirm.

## A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A routine traffic stop becomes an unreasonable seizure when law enforcement impermissibly exceeds the stop's scope or duration. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992).

8

*Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny delimit the permissible scope and duration of a routine traffic stop. *Rusher*, 966 F.2d at 875.

When a traffic stop strays outside the boundaries of its permissible scope or duration, the Fourth Amendment's exclusionary rule normally prevents the government from using evidence obtained therefrom against the victim of the illegal seizure. *See Davis v. United States*, 564 U.S. 229, 231–32 (2011). The exclusionary rule, however, is subject to certain exceptions. *Id.* at 236–38.

The good-faith doctrine, which protects law enforcement action taken "in objectively reasonable reliance on binding appellate precedent" at the time of the search or seizure, *see id.* at 232, applies here. The exclusionary rule serves the purposes of the Fourth Amendment by deterring police misconduct. *Id.* at 236–37. The good-faith doctrine recognizes that suppressing evidence obtained from a search or seizure previously sanctioned by precedent would "do nothing to deter police misconduct . . . [and] would come at a high cost to both the truth and public safety." *Id.* at 232.

Yet that is what Defendants seek here. They ask that we analyze Deputy McMurray's conduct in 2012 under the standards set out in *Rodriguez* and *Williams*, arguing that he violated their Fourth Amendment rights by asking off-topic questions before writing a ticket.[3] When Deputy McMurray executed this traffic stop in 2012,

---

[3] In *Williams*, this court applied *Rodriguez* to a stop that occurred prior to 2015. 808 F.3d at 241, 245. In *Williams*, however, the government conceded its de-minimis-delay argument on appeal and did not argue the good-faith exception. *Id.* at 245. In addition, *Williams* dealt with delay occurring after the officer issued a ticket, *id.* at 253, whereas here we discuss only de minimis delay occurring before issuance of a ticket. In
(Continued)

9

however, this court's binding precedent held that questioning or other activity unrelated to the initial purposes of the stop only rendered the stop unreasonable if the officer "failed to diligently pursue the purposes of the stop." *United States v. Digiovanni*, 650 F.3d 498, 509 (4th Cir. 2011).

In *Digiovanni* and similar cases decided prior to *Rodriguez*, we explained that de minimis delay in issuing a ticket warranted suppression only when an officer did not begin, or completely abandoned, actions related to the cited purpose of the stop in favor of embarking on another "sustained course of investigation . . . that constituted the bulk" of the stop. *Id.*; *see also United States v. Green*, 740 F.3d 275, 280 (4th Cir. 2014). For example, in *Digiovanni*, before even beginning the process of writing a ticket or verifying the defendant's information, the officer tried to get the defendant to open the trunk, questioned him extensively about the presence of drugs in the car, and radioed for backup--all without having any basis for reasonable suspicion that criminal activity was afoot. *Digiovanni*, 650 F.3d at 509–10, 513. This court concluded that "[t]he record, in particular the video, makes clear that at just about every turn [the officer] was conducting a drug investigation instead of a traffic infraction investigation." *Id.* at 510.

Here, by contrast, the record demonstrates that Deputy McMurray continued to pursue activities related to the initial stop and continued issuing the warning ticket throughout the pre-ticket process. Although Deputy McMurray asked off-topic questions

---

light of our application of *Davis*, we have no occasion here to consider whether the rule of *Rodriguez* and *Williams* applies to pre-ticket delay.

during this time, he did so while diligently attempting to (1) issue a warning ticket, (2) validate lawful possession of the car, (3) identify Defendants and run a record check for outstanding warrants (after Dodwell informed Deputy McMurray of prior arrests and convictions), and (4) dispel suspicion that criminal activity was afoot after Defendants gave conflicting accounts about their travels. *See United States v. Vaughan*, 700 F.3d 705, 710–12 (4th Cir. 2012); *United States v. Soriano-Jarquin*, 492 F.3d 495, 499–501 (4th Cir. 2007).

Under *Digiovanni* and other pre-*Rodriguez* cases, that Deputy McMurray may have been able to end the stop more quickly would not be dispositive. Determining reasonableness involved more than computing the average time it took to perform each required traffic-stop activity and cross-checking this value against a chart. *See United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008). We had previously upheld similar stops as reasonable where, despite multitasking, the officer continued to pursue the initial purpose for conducting the stop. *See United States v. Mason*, 628 F.3d 123, 131–32 (4th Cir. 2010). Assessing whether an officer unreasonably prolonged a stop involves "highly fact-specific inquiries." *United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011). Construing the evidence in the light most favorable to the government, as we must, we conclude that the district court did not err in finding that, under existing precedent, any pre-ticket delay did not warrant suppression.

## B.

We also conclude that Defendants waived their challenge to any post-ticket extension by failing to specifically object on those grounds before the district court.

11

*See United States v. Midgette*, 478 F.3d 616, 621–22 (4th Cir. 2007). This court's independent examination of Defendants' objections below confirms the district court's finding that "[n]either Defendant object[ed] to the Magistrate Judge's legal analysis contained in the M&R concerning the events following the conclusion of the traffic stop," that is, after Deputy McMurray issued the ticket. J.A. 155–56. If a defendant does not object to one of a magistrate's findings or recommendations "with sufficient specificity so as reasonably to alert the district court of the true ground for the objection" then that objection is waived on appeal. *Midgette*, 478 F.3d at 622; *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

## III.

We affirm today on the narrow ground that the stop did not offend our Fourth Amendment jurisprudence at the time it occurred. Similarly, we need not examine possible justifications for any post-ticket delay of the stop because Defendants waived their right to challenge that delay by failing to specifically object before the district court. For the reasons stated above, we affirm the district court's denial of Defendants' motions to suppress.

AFFIRMED