**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 20-4285

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

JOFFREY IZZY PEREZ,

        Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, Jr., District Judge.  (3:19−cr−00012−RJC−DSC−1)

Argued:  October 29, 2021                  Decided:  April 7, 2022

Before MOTZ, DIAZ, and RICHARDSON, Circuit Judges.

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Judge Richardson joined.  Judge Motz wrote an opinion concurring in the judgment.

**ARGUED:**  Carnell Travis Johnson, JOHNSON & NICHOLSON, PLLC, Charlotte, North Carolina, for Appellant.  Erik August Lindahl, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.  **ON BRIEF:**  R. Andrew Murray, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

DIAZ, Circuit Judge:

Joffrey Izzy Perez appeals the district court's denial of his motion to suppress three ounces of methamphetamine and two firearms seized during a traffic stop. Officers were alerted to the contraband after a canine unit conducted a dog sniff around the exterior of Perez's car. After the court denied his motion, Perez conditionally pleaded guilty to possession with intent to distribute at least 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

Perez argues that the officers unconstitutionally prolonged the traffic stop to conduct the dog sniff. The district court held otherwise, and we agree. We therefore affirm the judgment.

I.

A.

Officer Jean Marcel pulled over Perez after receiving information that the car Perez was driving had an expired registration tag.[1] Marcel also saw that the car's temporary tag—which had expired two days earlier—was issued by the Moore Automotive Group.

---

[1] A confidential informant had told police that Perez and a woman were selling large amounts of heroin and methamphetamine. But the government stipulated that the sole purpose of the stop was to investigate traffic infractions rather than suspected narcotics activity. J.A. 44.

Marcel had seen a similar tag during a previous investigation and learned that it was fictitious. As a result, Marcel suspected that the vehicle's tag was also fictitious.

Detective Todd Haigler, one of many officers at the scene, approached Perez (who was in the driver's seat) while Marcel stood on the passenger side. As Haigler spoke with Perez, Marcel examined the plate and radioed that he had pulled over a car with a fictitious tag.

Haigler asked for Perez's license but didn't immediately ask for the car's registration. He contacted police headquarters to confirm the license's status because he didn't have a laptop in his unmarked car. About four minutes and fifteen seconds into the stop, Haigler told Marcel that Perez's "license should not be good" and to begin "working" it up. J.A. 241 at 4:12–16.[2] He also told Marcel that "[the canine unit] should be on the way."[3] *Id.* at 4:17. Though Haigler contacted headquarters, he had Marcel continue the investigation into why Perez's license wasn't "good"[4] because Marcel, unlike Haigler, had a laptop in his vehicle.

---

[2] Citations to J.A. 241 refer to Marcel's body worn camera footage and identify the time measured from the beginning of the video rather than the beginning of the stop. The stop began about 20 seconds into the footage when Marcel pulled over the car. *See United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011) ("A traffic stop typically begins when a car 'is pulled over for investigation of a traffic violation.'" (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009))), *abrogated in part on other grounds by Rodriguez v. United States*, 575 U.S. 348 (2015).

[3] Another officer requested the canine unit before Marcel stopped Perez.

[4] Though Haigler couldn't recall exactly what headquarters told him about Perez's license, when he gave the license to Marcel, he "believe[d] [it] was suspended." J.A. 126.

3

Marcel returned to his car and began looking up Perez's license on the laptop. Another officer assisting with the stop asked if Marcel "ha[d] paperwork for th[e] car," and Marcel responded that he would "ask [about] that in a minute." *Id.* at 5:14–16. Though officers requested the car's registration, Perez didn't provide it.

Officers then waited to collect the vehicle identification number (VIN) until Haigler finished speaking with Perez at the driver's window and instructed him to exit the car. According to Marcel, doing so earlier presented some risk that they could be run over while retrieving the VIN. At about the six-minute mark, Perez exited the car at Haigler's request and waited with a handful of officers at the back of the vehicle. Then, at just over eight minutes, Marcel told another officer that Perez had a suspended license because of two prior convictions for driving while impaired. Marcel continued investigating Perez's license and gathering the information necessary to issue a citation.

At roughly eleven minutes and fifty seconds, Marcel asked an officer if he's "getting that [VIN]," which the officer then collected. *Id.* at 11:49. About a minute later, the officer returned to Marcel, reporting that the car had a valid "tag" and giving him the VIN. *Id.* at 13:02. Marcel then learned that the car wasn't registered to Perez. He also discovered that the true tag was valid for another month, though the tag affixed to the car was expired.

At about fifteen minutes into the stop, Marcel asked Haigler to move Perez to the side of the road and asked another officer to retrieve the car's registration. Within the next thirty seconds, the canine unit arrived.

After circling the car several times, the canine deputy told Marcel that there were two alerts: on "the driver's side and the trunk." *Id.* at 17:01. Over the next few minutes,

4

Marcel notified Haigler of the alerts, removed the fictitious tag, and searched the car. During the search, the officers found the methamphetamine and firearms at issue. Marcel ultimately cited Perez for operating a motor vehicle with a revoked driver's license and for operating a motor vehicle with an altered registration plate. Officers arrested Perez and arranged for the car to be towed.

B.

Perez moved to suppress the methamphetamine and firearms seized during the stop. He argued that the officers unconstitutionally prolonged the stop to conduct the dog sniff.

During the suppression hearing, the district court heard from Marcel, Haigler, and the canine deputy, and it reviewed video footage of the traffic stop. Perez contended that the purpose of the stop was pretextual, that the officers intentionally prolonged their investigation of Perez's license and the vehicle's plate while they waited for the canine unit to arrive, and that, in doing so, the officers abandoned the main purpose of the stop.

The district court questioned why a fifteen-minute stop was unreasonable given that the officers were investigating three infractions: "an expired tag[,] [a] possible fictitious tag, and a possible license revocation." J.A. 144. It also noted that the law doesn't require the officers to conduct the investigations "as fast as possible," as long as their duration was "reasonable." J.A. 145. The court explained that there's "no doubt [the officers were] hoping to find contraband as a result of this search," but their "subjective state of mind" was irrelevant because the question was "whether anything they did reasonably or unreasonably prolonged the stop." J.A. 148–49.

The court also asked the government why Marcel and Haigler's duplicative review of Perez's license wasn't an unreasonable delay. It inquired why Haigler or Marcel failed—either individually or "in tandem"—to process or even request the car's registration information for several minutes when the purpose of the stop was to investigate an expired tag. *See* J.A. 152–53.

The government responded that Haigler and Marcel did work in tandem, with Haigler first checking the license and, after realizing that it "might be suspended," giving it to Marcel to work up. J.A. 154. The government also argued that the standard is not whether "there [is] a remote possibility [that the stop] could have gone faster," (J.A. 153), and that "the law doesn't dictate how the officers go about conducting their investigations into . . . traffic offenses," (J.A. 155). Further, anything done (or not done) in the first few minutes "had nothing to do with prolonging the stop, especially since it[] occur[ed] at the outset" and was "in the normal course of [a] traffic stop." J.A. 155. The government conceded that this would be "a different kind of case," (J.A. 156), if the only infraction was an expired license plate, but given the number of offenses being investigated, "the propriety of the timing [was] sound," (J.A. 157).

C.

The district court denied Perez's motion, holding that the stop wasn't prolonged. Though the court "share[d] [Perez's] suspicions about why the car was stopped," it reasoned that the officers were investigating multiple infractions. Marcel, the court said, was "methodical" in his investigation, and the court found his testimony credible. J.A. 159–60. And this was so despite finding that Perez impeached Marcel with a prior

6

inconsistent statement between his report—in which Marcel wrote he approached Perez in the driver's seat—and his body worn camera footage, which showed that Haigler spoke to Perez while Marcel stood on the passenger side.

The district court credited Marcel's explanation that any delay in his investigation was because he (1) wasn't "a good multi-tasker," (2) experienced internet connectivity issues, and (3) waited to record the VIN for safety reasons. J.A. 160. It also held that, because of the fictitious tag, the car would be towed,[5] which "would have far exceeded the [fifteen] minutes it took for the canine to do its thing." *Id*. Thus, because the law doesn't require Marcel to conduct the "fastest investigation possible," "the canine search . . . did not prolong the stop." J.A. 161.

Following the court's ruling, Perez conditionally pleaded guilty to possession with intent to distribute 50 grams or more of methamphetamine and possession of a firearm in furtherance of a drug trafficking crime. He waived his right to appeal everything but the district court's finding that the officers had not unconstitutionally prolonged the traffic stop.[6] The district court sentenced Perez to 180 months' imprisonment.

---

[5] Marcel testified that it was procedure to remove a fictitious tag and tow the vehicle.

[6] The plea waiver says:

> The defendant reserves only the right to have the United States Court of Appeals for the Fourth Circuit review the District Court's July 11, 2019, adverse determination of his April 6, 2019 Motion to Suppress, filed as document number 16 on the district court's docket.

> The parties agree that the defendant may only appeal the district court's finding that the Monroe Police Department and the Union County Sheriff's

This appeal followed.

## II.

Perez argues that the district court erred in denying his suppression motion because the officers abandoned the purpose of the traffic stop and deliberately delayed their investigation so the canine unit could conduct its dog sniff. He also contends that the court clearly erred by crediting Marcel's testimony after he impeached Marcel with a prior inconsistent statement. We reject these arguments and affirm the district court.

## A.

"In considering the appeal of a denial of a motion to suppress, we review the district court's conclusions de novo and its factual findings for clear error." *United States v. Slocumb*, 804 F.3d 677, 681 (4th Cir. 2015). We "construe the evidence in the light most favorable to the government—the prevailing party below." *Id.* But we're "not limited to the district court's reasoning" and may "affirm on any ground supported by the record." *United States v. Brown*, 701 F.3d 120, 125 (4th Cir. 2012) (cleaned up).

A traffic stop "constitutes a 'seizure' under the Fourth Amendment and is thus subject to a reasonableness requirement." *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). And "[b]ecause

---

Office did not unconstitutionally prolong the duration of the traffic stop that resulted in the defendant's arrest when a Union County Sheriff's Deputy walked a drug-sniffing dog around the defendant's motor vehicle.

J.A. 173.

a traffic stop is more akin to an investigative detention than a custodial arrest," courts review the stop under the two-prong standard in *Terry v. Ohio*, 392 U.S. 1 (1968). *Id.* Under *Terry*, a traffic stop is reasonable if (1) the stop is legitimate at its inception[7] and (2) the officer's actions during the stop are reasonably related in scope to the basis for the stop. *See United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018).

During a traffic stop, "[a]n officer may engage in 'ordinary inquiries incident to' the traffic stop, such as inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017) (citing *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)). An officer may also "engage in certain safety measures, but generally must focus his attention on the initial basis for the stop." *Id.*

While "the Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention," the seizure remains lawful only "so long as [unrelated] inquiries do not measurably extend the duration of the stop." *Rodriguez*, 575 U.S. at 354–55 (cleaned up). One such inquiry is a dog sniff—a permissible technique to

---

[7] Perez claims that he may appeal whether the traffic stop was pretextual. But the only issue preserved for appeal via the plea waiver is whether the officers unlawfully prolonged the traffic stop. *See United States v. Blick*, 408 F.3d 162, 168 (4th Cir. 2005). Regardless, because the vehicle's license plate was expired and—based on Marcel's experience—likely fictitious, Marcel had a legitimate reason to stop Perez. *See* N.C. Gen. Stat. §§ 20-111(1), (2); *see also United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016) ("In assessing the legitimacy of a traffic stop, we do not attempt to discern an officer's subjective intent for stopping the vehicle.").

identify narcotics. *See, e.g., Illinois v. Caballes*, 543 U.S. 405, 407–09 (2005). The "critical question" is not whether the dog sniff "occur[red] before or after the officer issue[d] a ticket," but whether the "tasks tied to the traffic infraction [we]re—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354, 357.

But because a sniff is "intended to detect 'ordinary criminal wrongdoing,' [it] may not prolong the duration of the traffic stop absent consent of those detained or reasonable suspicion of criminal activity." *Hill*, 852 F.3d at 382 (citing *Rodriguez*, 575 U.S. at 355–57). Thus, "[t]o prolong a traffic stop 'beyond the scope of a routine traffic stop,' an officer 'must possess a justification for doing so other than the initial traffic violation.'" *United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011) (quoting *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008)).

B.

Perez first argues that the officers abandoned the main purpose of the stop and prolonged it for the canine unit to arrive. The government responds—and the district court found—that, though the stop began with the expired tag, it developed into an investigation for a fictitious plate and revoked license. The government further contends that, given the multiple infractions being investigated, the length of the stop was reasonable. We agree.

In the first four minutes of the stop, Haigler spoke to Perez and checked his license. Meanwhile, Marcel radioed in the traffic stop and reported that the car's license plate was fictitious. True, it may have been more expeditious for Haigler to request the vehicle's registration at the same time. But confirming the status of a driver's license is one of the "ordinary inquiries" courts allow during a routine traffic stop. *See Rodriguez*, 575 U.S. at

10

355 ("Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."). We don't mandate the order in which these inquiries must occur, and Haigler learned in his communication with headquarters that Perez's license "should not be good." When he told Marcel as much, Marcel continued investigating the license, along with the expired and fictitious plate.

The investigations didn't occur at once, with Marcel focusing on Perez's license rather than the vehicle's plate. But the court credited the officers' testimony that the delay was in part because of (1) Marcel's shortcomings as a "multi-tasker," (2) his struggles with the internet connection, and (3) safety concerns while Perez was still in the vehicle. And the court found that Marcel "handled [the VIN investigation] in due time after conducting a driver's license check." J.A. 160.

Viewed in the light most favorable to the government, the district court didn't clearly err. Given that "traffic stops are especially fraught with danger to police officers," an officer may "take certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 575 U.S. at 356 (cleaned up). We agree with the district court that it was a reasonable precaution for officers to wait until Haigler instructed Perez to exit the vehicle to collect its VIN. It was also negligibly burdensome because Marcel began investigating Perez's license while he waited for the VIN. Perez couldn't provide the vehicle's registration, which would have expedited the process, so the "investigation took some time." J.A. 160.

11

There's no dispute that the officers lacked reasonable suspicion of additional criminal activity to justify the dog sniff. *See United States v. Jordan*, 952 F.3d 160, 166 (4th Cir. 2020) (finding that an initially lawful but prolonged traffic stop becomes unlawful unless the officers "develop reasonable suspicion of ongoing criminal activity"). Thus, if the sniff prolonged the time required to "'complete the mission' of [the stop]—inspecting [Perez's] license and registration, [and] issuing a ticket"—then it would be unlawful. *Id.* (quoting *Bowman*, 884 F.3d at 209–10). But not only had officers not finished investigating the multiple infractions by the time the canine unit arrived, they also hadn't issued Perez citations for the infractions.

And once officers confirmed that the vehicle's plate was fictitious and that Perez's license was revoked, Perez couldn't simply drive away even if the citations had been issued.[8] The officers testified that they called for the car to be towed, and it hadn't been by the time the dog sniff occurred.[9]

In sum, though the stop could have been shorter (and begun more efficiently), it wasn't impermissibly prolonged. Marcel and Haigler's actions were reasonably related to investigating an expired license plate. And this basis for the stop quickly mushroomed into other inquiries that each took time. Though Marcel at first waited for Haigler to check Perez's license, the stop also involved a fictitious tag. After Haigler gave him Perez's

---

[8] A fictitious plate is unlawful to display under North Carolina law. N.C. Gen. Stat. § 20-111(2).

[9] The government waived any argument that the drugs and firearms would have been discovered even without the dog sniff under the inevitable discovery doctrine.

12

license, Marcel continued investigating why the license wasn't "good" on his laptop before turning to an investigation of the tag. The "acceptable length of a routine traffic stop can't be stated with mathematical precision," but the officers here were diligent enough to pass constitutional muster. *United States v. Digiovanni*, 650 F.3d 498, 511 (4th Cir. 2011) (cleaned up), *abrogated in part on other grounds by Rodriguez*, 575 U.S. at 348.

*Hill* offers a useful comparison. There, we upheld a 20-minute stop even though it could have been conducted about two minutes faster. 852 F.3d at 382–84. The officers were investigating a driver's and passenger's licenses and wrote two summonses for the driver before a canine unit arrived. *Id.* at 380. They testified that searching various law enforcement databases to investigate the licenses took about eight minutes and writing the summonses took another ten. *Id.* at 382; *see also United States v. Salkil*, 10 F.4th 897, 899 (8th Cir. 2021) (crediting testimony that a traffic stop investigating a single infraction took an average of 12 minutes).

Here, by contrast, the officers investigated Perez's license and the car's expired and fictitious tag, and then wrote multiple citations. Considering the attendant circumstances, we agree with the district court that the stop was not unreasonably prolonged.

## C.

As for Marcel's testimony, we aren't persuaded that the district court clearly erred in finding him credible. *See United States v. Palmer*, 820 F.3d 640, 653 (4th Cir. 2016) ("When reviewing factual findings for clear error, we particularly defer to a district court's credibility determinations, for it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress." (cleaned up)). The court

13

acknowledged that Perez "impeached" Marcel with a prior inconsistent statement on who first approached the driver's side of the car. J.A. 146. Perez argues that because of Marcel's impeachment on that fact—which the body worn camera footage readily corrected—the district court should have discredited his entire testimony about the stop, including that the car would be towed. We disagree.

The district court noted Marcel's impeachment on this minor fact, but otherwise found him credible. It also agreed that a car with a fictitious tag would be towed,[10] which seems reasonable given that Perez wasn't the car's registered owner and was arrested during the stop. The court was best suited to evaluate Marcel's credibility, and we decline to disturb its assessment.

## III.

For the reasons given, we affirm the district court's judgment.

*AFFIRMED*

---

[10] Perez argues that there's no legal requirement in North Carolina that a vehicle with a fictitious tag must be towed. But N.C. Gen. Stat. § 160A-303 provides for the removal of junked or abandoned vehicles and defines a junked vehicle as one that "[d]oes not display a current license plate." *Id.* § 160A-303(b2)(4). It also provides for removal if a vehicle "is determined by law enforcement to be a hazard to the motoring public." *Id.* § 160A-303(b1)(4).

14

DIANA GRIBBON MOTZ, Circuit Judge, concurring:

I concur in the judgment because of the district court's factual finding that the need to tow Perez's car — after the officers determined it had a fictitious tag and that his license had been revoked — meant that Perez was not free to drive away after receiving the citations. Given this factual finding, I cannot say that the officers prolonged the stop in violation of the Fourth Amendment. Officers may engage in activity unrelated to the reasons for the traffic stop as long as that activity does not extend the overall duration of the stop. *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017). I write separately, however, to emphasize that law enforcement officers may not deliberately draw out an investigation of a traffic stop to give a canine unit time to arrive and conduct a dog sniff.

I.

Because a traffic stop is a seizure under the Fourth Amendment, it must be supported by reasonable suspicion of criminal activity. *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018) (citing *Terry v. Ohio*, 329 U.S. 1 (1968)). Even if lawful at its inception, a traffic stop can become unconstitutional "if it is prolonged beyond the time reasonably required to complete [the] mission" of issuing a ticket. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

To determine if a stop was extended beyond the time "reasonably required," we consider whether the officers investigating the traffic violation were "reasonably diligent" in their investigation. *Rodriguez v. United States*, 575 U.S. 348, 354, 357 (2015); *Hill*, 852 F.3d at 381–82. To be reasonably diligent, officers must "focus . . . on the initial basis for the stop" and "may engage in ordinary inquiries incident to the traffic stop, such as

15

inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." *Hill*, 852 F.3d at 382 (internal quotation marks omitted).

A dog sniff is *not* considered one of the "ordinary inquiries incident to" a traffic stop. *Rodriguez*, 575 U.S. at 355–56. That is because a dog sniff "lack[s] the same close connection to roadway safety as the ordinary inquiries." *Id.* at 356. Thus, an officer may conduct a dog sniff while investigating the traffic violation, but once the investigation is complete or "reasonably should have been" completed, the officer may not prolong the stop in order to conduct a dog sniff. *Id.* at 354–55.

When determining whether officers acted with reasonable diligence, "we consider 'what the police in fact do,' and whether the officers acted reasonably under the totality of the circumstances presented to them." *Hill*, 852 F.3d at 381 (quoting *Rodriguez*, 575 U.S. at 357). For instance, when officers delay traffic stops to "attend to related safety concerns," the Supreme Court and this Court have found those delays reasonable. *Rodriguez*, 575 U.S. at 354. That is because "an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Id.* at 356. For example, in *Hill*, we held that an officer did not unconstitutionally prolong an investigation by standing next to a car instead of assisting with database searches when the individuals in the car were "likely armed." 852 F.3d at 383. Similarly, we have held that an officer conducting a late-night stop may reasonably wait for others to arrive for safety reasons

16

before starting an investigation. *See United States v. Buzzard*, 1 F.4th 198, 202, 204 (4th Cir. 2021).

By contrast, engaging in an unrelated investigation into another crime before relaying a driver's license information to a dispatcher constitutes a lack of reasonable diligence. *United States v. Digiovanni*, 650 F.3d 498, 510 (4th Cir. 2011), *abrogated in part on other grounds by Rodriguez*, 575 U.S. at 348; *see also Rodriguez*, 575 U.S. at 356 ("On-scene investigation into other crimes . . . detours from the officer's traffic-control mission."). Finally, and relevant here, we have said explicitly that "an officer's decision to execute a traffic stop in a *deliberately slow or inefficient manner*, in order to expand a criminal investigation . . . without reasonable suspicion of criminal or consent of those detained" may "compel" a finding of a Fourth Amendment violation. *Hill*, 852 F.3d at 384 (emphasis added).

## II.

Turning now to the case before us, two aspects of the officers' behavior during the traffic stop signal a lack of diligence. First, the record indicates the officers clearly intended that the stop last long enough for the canine to arrive and sniff Perez's car. Second, the officers' collective failure to investigate the tag until almost twelve minutes into the stop belies any claim that they worked efficiently.

## A.

The officers obviously aimed to search the car for drugs from the very beginning of the stop. As the majority notes, an officer requested a canine unit *even before* Officer Jean

17

Marcel stopped Perez.[*] Op. at 3 n.3. Marcel learned that a canine had been dispatched to the scene as early as four minutes into the stop. Detective Todd Haigler, a narcotics detective, made it a point to inform Marcel of that fact when he handed over Perez's license. Nearly ten minutes into the stop, Haigler again approached Marcel to inform him that the dog would arrive "in less than two minutes." The officers' concern with the timing of the dog's arrival is thus evident from the record.

That concern is further supported by evidence indicating that from the beginning, "[t]his was no mere traffic stop." *Hill*, 852 F.3d at 385 (Davis, J. dissenting). Multiple armed officers were present at this ostensibly routine traffic stop, including narcotics detectives. And the government initially contended it had received information that Perez was involved in narcotics activity. It only withdrew that justification for the stop when pushed to reveal the identity of its informant. After reviewing these facts, the district court concluded that "there's no doubt that these officers and detectives wanted to search that car." The court later emphasized that it was "sure that the car was stopped because those officers and detectives believed that drugs or something would be found in that car."

Of course, the Constitution permits an officer to stop a driver for committing a minor traffic infraction even if that officer actually seeks to investigate some other, more serious criminal activity. The Supreme Court said as much in *Whren v. United States*, 517 U.S. 806, 813 (1996). *See also United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016)

---

[*] These facts stand in sharp contrast to *Hill*, where the officer "requested the K-9 unit only after being notified . . . that the driver and Hill were 'likely armed' and had been involved in drug trafficking activity." 852 F.3d at 384 n.4.

("[W]e do not attempt to discern an officer's subjective intent for stopping the vehicle."). But the officers' obvious intention to search the car for drugs *can* inform our review of possible delays *during* the traffic stop. *See Hill*, 852 F.3d at 384 (noting concern with a case in which officers act inefficiently with a purpose to "expand a criminal investigation"). In short, "[a]n obviously pretextual stop . . . calls for more skepticism" of law enforcement's claim of reasonable diligence. *United States v. Cole*, 21 F.4th 421, 446 (7th Cir. 2021) (Hamilton, J., dissenting).

B.

When viewed in light of the officers' focus on the canine officer's arrival, their actions appear aimed at delaying the resolution of the stop. At the start, as the district court noted when it denied Perez's motion to suppress, no one asked Perez for the vehicle's registration. *Cf. United States v. Gomez*, 877 F.3d 76, 91 (2d Cir. 2017) (holding that officers unlawfully prolonged stop and emphasizing that officer asked for registration "but notably not [a driver's] license — necessary to write a ticket"). The failure to ask for registration seems questionable, especially considering Marcel's later testimony that registration paperwork tends to speed the process up "tremendously."

Marcel testified that absent registration, he needed the vehicle identification number (VIN) to efficiently investigate a suspected fictitious tag. But incredibly, neither he nor any other officer attempted to obtain the VIN until close to twelve minutes into the stop. To be sure, as the majority rightly notes, the district court credited Marcel's explanation that the officers waited to obtain the VIN for safety reasons. Op. at 7. In particular, the district court found that approaching the front of the car to take a picture of the VIN while

19

Perez sat in the driver's seat would endanger the officers. We must, of course, defer to that factual finding. But notably, the video recording reveals multiple officers standing idle for several minutes *even after* Perez exited the car. *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (disregarding the version of events credited by the lower court to the extent it failed to "view[] the facts in the light depicted by the videotape"). As the majority notes, Perez exited the car at "about the six-minute mark" and an officer collected the VIN at "roughly eleven minutes and fifty seconds." Op. at 4.

By way of justification, Marcel testified that he is "not a good multi-tasker." Even so, the Government does not explain why another one of the many officers present could not have investigated the tag earlier. *See Gomez*, 877 F.3d at 92 (emphasizing that one of two officers at a traffic stop "stood by and watched" in determining that the extended traffic stop violated the Fourth Amendment). And the sheer number of officers on the scene undercuts any proffered safety justification and distinguishes this case from past cases in which a lone officer was "outnumbered." *Buzzard*, 1 F.4th at 203. For example, in *Hill*, we excused an officer's decision to "stand next to the car during most of the stop, rather than assist" with the investigation for safety reasons because there the officers received an alert that the individuals stopped were "likely armed." 852 F.3d at 383. Here, by contrast, there is no indication that Perez was armed or dangerous, and *he* was the one outnumbered.

III.

We should take seriously *Hill*'s warning against "deliberately slow or inefficient" traffic stops intended to allow for the pursuit of unrelated criminal investigations. 852 F.3d at 384; *cf. United States v. Sharpe*, 470 U.S. 675, 687 (1985) (emphasizing there was "no

20

evidence that the officers were dilatory in their investigation"). In the absence of the district court's crediting of Marcel's testimony that the vehicle would be towed, this would have been just the case we were concerned about in *Hill*.

However, I am compelled to affirm because the district court credited Marcel's testimony that a car with a fictitious tag would be towed in any event. "We particularly defer to a district court's credibility determinations, for 'it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress.'" *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008) (quoting *United States v. Murray*, 65 F.3d 1161, 1169 (4th Cir. 1995)). Thus, Perez could not have freely driven away once Marcel issued the citations, even if those citations had been issued earlier. Therefore, the stop could not have ended at that earlier time. *See United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008) (explaining that a routine traffic stop ends "once the driver has demonstrated that he is entitled to operate his vehicle, . . . the police officer has issued the requisite warning or ticket, [and] the driver 'must be allowed to proceed on his way.'" (quoting *United States v. Rusher*, 966 F.2d 868, 876 (4th Cir. 1992))); *see also United States v. Soderman*, 983 F.3d 369, 374 (8th Cir. 2020) (holding that stop was justifiably extended due to the driver's "legal inability to remove the vehicle from the scene and the consequential need for a licensed driver or a tow truck to do so"). For this reason, I concur in the judgment.

21