**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 22-4647**

─────────────

UNITED STATES OF AMERICA,

   Plaintiff – Appellee,

v.

JOSEPH WAYNE DADISMAN,

   Defendant – Appellant.

─────────────

Appeal from the United States District Court for the Northern District of West Virginia, at Elkins.  Thomas S. Kleeh, Chief District Judge.  (2:21-cr-0031-TSK-MJA-1)

─────────────

Argued:  March 18, 2025        Decided:  May 28, 2025

─────────────

Before GREGORY and HARRIS, Circuit Judges, and KEENAN, Senior Circuit Judge.

─────────────

Affirmed in part, vacated in part, and remanded with instructions by unpublished opinion. Senior Judge Keenan wrote the opinion, in which Judge Gregory and Judge Harris concurred.

─────────────

**ARGUED:**  Diana Stavroulakis, Weirton, West Virginia, for Appellant.  Stephen Donald Warner, OFFICE OF THE UNITED STATES ATTORNEY, Elkins, West Virginia, for Appellee.  **ON BRIEF:**  William Ihlenfeld, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

─────────────

Unpublished opinions are not binding precedent in this circuit.

BARBARA MILANO KEENAN, Senior Circuit Judge:

A federal grand jury charged Joseph Dadisman with one count of possession with intent to distribute more than fifty grams of methamphetamine in violation of 21 U.S.C. §§ 841(a), (b)(1)(A). Dadisman filed a motion to suppress certain evidence, challenging as unreasonable a traffic stop and "dog sniff" conducted by law enforcement that resulted in the discovery of methamphetamine on his motorcycle. After holding an evidentiary hearing, a magistrate judge recommended denial of Dadisman's motion, and the district court adopted that recommendation. Dadisman entered a guilty plea to the charged offense under a plea agreement that reserved his right to appeal the denial of his motion to suppress. The district court later entered a judgment of conviction and imposed a sentence of 136 months in prison.

On appeal, Dadisman argues that: (1) the initial justification for the traffic stop, his invalid motorcycle registration, was merely pretext for the officers to conduct an unlawful drug investigation; (2) the officers were not justified in searching Dadisman's motorcycle for weapons; and (3) the officers unlawfully expanded the duration and scope of the traffic stop to pursue a drug investigation. We conclude that Dadisman waived his challenge to the initial traffic stop by failing to object on this basis to the magistrate judge's report and recommendation. And because, at the time Dadisman was stopped, he admitted that he had a firearm on his nearby motorcycle, the officer plainly was permitted to perform a limited search of the motorcycle for weapons. Finally, we conclude that the district court failed to conduct the necessary analysis before upholding the search of Dadisman's motorcycle for drugs, including whether the officers impermissibly prolonged the traffic

2

stop by failing to diligently pursue the mission of the stop. We therefore vacate the district court's judgment, and we remand the case for the court to conduct the necessary analysis.

## I.

The following facts were established during the suppression hearing before the magistrate judge.[1] Brett Carpenter, Sheriff of Barbour County, West Virginia, testified that his department had received complaints that methamphetamine was being sold from Dadisman's residence. According to Sheriff Carpenter, Dadisman was a "big player" in trafficking methamphetamine.

On June 29, 2021, Sheriff Carpenter and other officers were near Dadisman's residence when Carpenter saw Dadisman leave his house on a motorcycle. At that time, Sheriff Carpenter knew that Dadisman did not have a valid motorcycle endorsement on his driver's license. Sheriff Carpenter also learned from another officer that Dadisman's motorcycle registration belonged to a different motorcycle, rendering the registration invalid.

Based on the registration violation, Sheriff Carpenter activated the emergency lights on his cruiser to begin a traffic stop of Dadisman. After Dadisman stopped his motorcycle at a gas station, Sheriff Carpenter parked his vehicle behind the motorcycle. Meanwhile,

---

[1] Because the government prevailed in the district court, we state the facts in the light most favorable to the government. *United States v. Frazier*, 30 F.4th 1165, 1172 (4th Cir. 2022).

3

another officer, hearing about the traffic stop on law enforcement radio, requested that a K-9 unit with a "trained narcotics dog" report to the scene of the stop.

As Sheriff Carpenter and Dadisman stood about 10 feet from the motorcycle, Sheriff Carpenter frisked Dadisman and did not find any weapons. But Carpenter also told Dadisman that he had observed ammunition in plain view in a mesh bag on the side of the motorcycle. After Dadisman admitted that he kept a handgun in a bag on his motorcycle, Carpenter removed the gun from the bag and placed the gun in his official vehicle.

Sheriff Carpenter stated that he "tr[ied] to get the serial number on the firearm to run [it] through [the] com[munication] center." At this point, about three and one-half minutes had elapsed since the stop began. The record does not contain any information about whether an officer actually ran a "background check" on the firearm. By this time, Chief Deputy Jeff Roy of the Barbour County Sheriff's department and two other officers had arrived on the scene.

Sheriff Carpenter also testified that he intended to have the motorcycle towed based on the improper registration, and that he would not have permitted Dadisman to drive the motorcycle away from the scene. The record further shows that for the next six and one-half minutes, Sheriff Carpenter and Chief Deputy Roy engaged Dadisman in conversation, which included asking whether Dadisman had any drugs located on his motorcycle.[2]

---

[2] We observe that there were two factual disputes that were unresolved by the magistrate judge and the district court. First, the record contains unresolved conflicting evidence regarding whether Dadisman admitted to possessing "a small bag of methamphetamine" on the motorcycle *before* the dog alerted on the motorcycle. Second, the record is unclear whether Dadisman consented to the search of his motorcycle for drugs before the arrival of the K-9 unit.

4

Less than ten minutes after the stop began, the K-9 unit arrived.  During a dog sniff of the motorcycle, the dog alerted on a bag attached to the motorcycle.  After Dadisman removed from that bag about 500 grams of methamphetamine, the officers placed him under arrest.  The officers later obtained a search warrant for Dadisman's residence, where they found additional methamphetamine and firearms.

After hearing the evidence, the magistrate judge issued a report and a recommendation to deny Dadisman's motion to suppress.  The magistrate judge concluded that the initial traffic stop was permissible based on the improper registration appearing on the motorcycle's license plate.  The magistrate judge also concluded that the search of Dadisman's motorcycle for the firearm was lawful, and that the temporary detention of less than ten minutes was reasonable.  Dadisman filed objections to the magistrate judge's report relating to the court's ruling on the officers' search for weapons and the delay that occurred while awaiting the K-9 unit's arrival.  Notably, Dadisman did not raise an objection to the magistrate judge's conclusion that the initial traffic stop was justified.  The district court rejected Dadisman's objections and issued an opinion denying the suppression motion.

In its ruling, the district court held that Sheriff Carpenter's limited search of Dadisman's motorcycle for weapons was justified.  In support of this conclusion, the court observed that Dadisman already had admitted possessing a firearm on his motorcycle and that he was standing only about 10 feet from the motorcycle when the search occurred.  The court therefore determined that the officer was permitted to search the motorcycle to eliminate the risk that Dadisman's firearm could be used against the officers.

5

Addressing the length of the stop, the court observed that based on the motorcycle's invalid registration, the parties agreed "that Dadisman could not have driven [the motorcycle] away." The court concluded that "under these circumstances[,]" "the period of delay" while the officers awaited the K-9 unit was reasonable. Dadisman now appeals from the district court's judgment.

## II.

### A.

Dadisman raises three arguments on appeal. First, he contends that the officers initiated a pretextual traffic stop for a registration violation when they instead intended to conduct a drug investigation. Second, Dadisman argues that Sheriff Carpenter violated his Fourth Amendment rights by searching his motorcycle for weapons. According to Dadisman, the officer's safety was not threatened, and he was not justified in conducting a "protective search" of the motorcycle. Finally, Dadisman submits that the officers unlawfully extended the duration of the stop, detaining him longer than necessary to issue a citation for an unregistered motorcycle so the officers could conduct a drug investigation and await the arrival of the K-9 unit.

In response, the government first contends that Dadisman failed to preserve in the district court his argument challenging the initial justification for the traffic stop and, thus, this argument should be reviewed only for plain error. Addressing the merits of the argument, the government submits that because the motorcycle had an invalid registration, the court did not plainly err in upholding the initial justification for the traffic stop. The

6

government also contends that because Dadisman was standing near the motorcycle after the stop occurred, the officers were justified in performing a limited search of the motorcycle to secure the firearm.

Regarding the length of Dadisman's detention, the government offers two responses.[3] The government first contends that the 10-minute traffic stop was "short," and was not longer than necessary "to impound the motorcycle" and to complete the mission of the stop. The government thus submits that Dadisman's detention was reasonable and was not improperly extended to ensure the arrival of the K-9 unit. Alternatively, the government contends that the officers had reasonable suspicion that Dadisman was engaged in drug trafficking. The government suggests that because Dadisman possessed a firearm and Sheriff Carpenter had received tips[4] that Dadisman sold methamphetamine, the officers had reasonable suspicion to extend Dadisman's detention for the arrival of the K-9 unit.

---

[3] We observe that the government did not rely on below, and does not raise on appeal, the doctrine of inevitable discovery, which "allows the government to use evidence gathered in an otherwise unreasonable search" if the government shows that law enforcement would ultimately have discovered the evidence by lawful means, such as an inventory search. *United States v. Seay*, 944 F.3d 220, 223 (4th Cir. 2019). Thus, any reliance on this doctrine has been forfeited. *See United States v. Edwards*, 666 F.3d 877, 887 (4th Cir. 2011) (explaining that because the government bears the burden to prove inevitable discovery, this Court will not consider it *sua sponte* as an alternative basis for affirmance). Here, the record lacks any evidence regarding the procedures applicable to impounding and searching the motorcycle, barring consideration of the inevitable discovery doctrine. *See Seay*, 944 F.3d at 223 (explaining that the government must show that an inventory search has been conducted according to standardized criteria).

[4] We observe that the record does not include the content, number, or details of these tips.

7

B.

Before addressing these arguments, we set forth some general principles. When a district court has denied a motion to suppress, we review the court's legal conclusions de novo and its factual findings for clear error. *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017). A traffic stop constitutes a "seizure" under the Fourth Amendment and is subject to review for reasonableness. *Id.*; *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015). For an investigative detention during a traffic stop to be reasonable, the traffic stop must be lawful at its inception, and the officers' actions during the stop must be "reasonably related in scope" to the basis for the stop. *United States v. Miller*, 54 F.4th 219, 228 (4th Cir. 2022) (citation omitted); *Hill*, 852 F.3d at 381; *Williams*, 808 F.3d at 245; *see Rodriguez v. United States*, 575 U.S. 348, 357 (2015) (explaining that courts consider "what the police in fact do").

Initially, we reject Dadisman's challenge that the officers' original justification for the traffic stop was pretextual.[5] Dadisman has "waived" this argument by failing to object to the magistrate judge's report and recommendation on this ground. *U.S. v. Midgette*, 478 F.3d 616, 621-22 (4th Cir. 2007); Fed. R. Crim. P. 59(b)(2); *see* 28 U.S.C. § 636(b)(1)(C). We nonetheless observe that even if we reviewed this argument for plain error, we would conclude that the traffic stop was lawful at its inception. Although Sheriff Carpenter may

---

[5] Dadisman also submits that Sheriff Carpenter was not aware of the invalid registration at the time of the traffic stop. However, the record refutes this contention. Sheriff Carpenter testified that before the traffic stop, another officer had informed him of the invalid registration after conducting an electronic check of the status of the license plate.

have had another motive for the stop, the stop was lawful based on the invalid registration of the motorcycle. *See Whren v. United States*, 517 U.S. 806, 813 (1996) (explaining that officers' underlying motives do not render otherwise valid stops unreasonable). So, we turn directly to the issues whether the officers' actions during the traffic stop and the duration of the stop unreasonably infringed Dadisman's rights under the Fourth Amendment. *Hill*, 852 F.3d at 381; *Williams*, 808 F.3d at 245.

We first consider the reasonableness of the officers' search of the motorcycle for weapons. During a traffic stop, officers may conduct a "limited search" for weapons when the detained person may be armed and dangerous. *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *see United States v. Robinson*, 846 F.3d 694, 698-700 (4th Cir. 2017) (en banc) (explaining that when an officer reasonably suspects that the person he has stopped is armed, the officer is justified in thinking that his safety is in danger). The purpose of a limited, protective search under *Terry* is to permit the officers to pursue the investigation without fear of violence. *United States v. Buster*, 26 F.4th 627, 634 (4th Cir. 2022) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)); *see Michigan v. Long*, 463 U.S. 1032, 1048-49 (1983) (explaining that protective search of vehicle is permissible upon reasonable belief that suspect is dangerous and may gain control of weapons).

Here, we easily conclude that Sheriff Carpenter was justified in conducting a limited search for weapons on Dadisman's motorcycle. After Sheriff Carpenter observed ammunition in a mesh bag on the side of the motorcycle, Dadisman admitted to possessing the firearm. At that point, Dadisman was standing unrestrained about 10 feet from the motorcycle and potentially had access to a weapon. Accordingly, Sheriff Carpenter

9

reasonably suspected that Dadisman was armed and dangerous, justifying the limited search to retrieve the weapon from the motorcycle to ensure the officers' safety during the traffic stop. *See Dickerson*, 508 U.S. at 373. We therefore conclude that the district court correctly denied Dadisman's motion to dismiss on this basis.

We next consider whether the officers unreasonably extended the duration and scope of the traffic stop. An officer's authority to seize an occupant of a vehicle ends when the officer's activities related to the traffic infraction reasonably should have been completed. *Rodriguez*, 575 U.S. at 354; *see Williams*, 808 F.3d at 245-46. Although the permitted length of a stop cannot be determined with precision, even de minimis delays caused by unrelated inquiries may violate the Fourth Amendment in the absence of reasonable suspicion. *Rodriguez*, 575 U.S. at 355-57; *Hill*, 852 F.3d at 381.

An officer must be reasonably diligent in completing traffic-based inquiries. *Hill*, 852 F.3d at 381-82. While diligently pursuing the purpose of the traffic stop, officers may conduct certain unrelated inquiries during the stop. *Id.* But officers may not do so in a way that prolongs the stop unless there is a separate basis justifying the detention. *Rodriguez*, 575 U.S. at 355; *Hill*, 852 F.3d at 381-82. So, while an officer may question a vehicle's occupants on topics unrelated to the traffic stop and may engage a K-9 unit to conduct a dog sniff, *Hill*, 852 F.3d at 382, the officers may not prolong a stop for these purposes without consent of the detainee or without reasonable suspicion of criminal activity, *Rodriguez*, 575 U.S. at 355-56; *see also Miller*, 54 F.4th at 228.

Determining whether a traffic stop was impermissibly prolonged is a fact-specific inquiry. For example, in *Hill*, we upheld a 20-minute traffic stop that had been initiated

10

for speeding, even though the record showed that the stop likely could have been completed about two minutes faster. 852 F.3d at 383-84 (explaining that when the drug dog arrived, one officer was working in the cruiser to investigate the driver's license and the passenger's identification and to prepare summonses for the driver, while another officer simultaneously asked the detained individuals if they had drugs or guns in the car). Critically, we concluded that although there may have been "brief periods unaccounted for" in the officers' conduct, the stop was not prolonged for purposes beyond the mission of the stop, and the officers executed the tasks related to the stop with reasonable diligence. *Id*. (noting that an officer who executes a stop in "a deliberately slow or inefficient manner, in order to expand a criminal investigation within the temporal confines of the stop without reasonable suspicion" could compel a conclusion that the officer has violated the Fourth Amendment).

In *United States v. Perez*, 30 F.4th 369 (4th Cir. 2022), we considered a traffic stop in which the police were investigating several traffic-related violations, including the use of a fictitious license tag and driving with a suspended operator's license. Early in the fifteen-minute detention, the officers requested a K-9 unit, which arrived before the officers had issued citations for the infractions or had completed the necessary process of having the defendant's vehicle towed. *Id.* at 372. When the trained narcotics dog alerted at two locations while circling the defendant's vehicle, the officers conducted a search of the vehicle that yielded methamphetamine and firearms. *Id.* at 372-73. In upholding the validity of the search, we observed that the proper analytical focus for determining the validity of a dog sniff is whether the "'tasks tied to the traffic infraction [we]re—or

11

reasonably should have been—completed'" before the sniff occurred. *Id.* at 375-76 (quoting *Rodriguez*, 575 U.S. at 354). We held that although the stop at issue could have been shorter, the officers' ongoing activity related to the mission of the stop showed that the stop was not "impermissibly prolonged." *Id.* at 376.

In the present case, the record shows that after Sheriff Carpenter conducted a protective frisk and secured Dadisman's firearm, Sheriff Carpenter and Deputy Roy engaged Dadisman in conversation for about six and one-half minutes before the K-9 unit arrived. The record further shows that during that time, the officers questioned Dadisman about drug possession, a subject unrelated to the motorcycle's invalid registration. However, it is not apparent from the record whether the officers simultaneously were taking the necessary steps to complete the mission of the traffic stop involving the improper registration and whether these tasks should have been completed before the dog sniff occurred.

In its ruling, the district court appeared to assume that there was a "period of delay" while the officers awaited the K-9 unit, but that any such delay necessarily was reasonable because the K-9 unit arrived quickly and because the motorcycle had not yet been towed away from the scene. In reaching this conclusion, however, the court skipped certain analytical steps.

As described above, a trial court evaluating whether an initially lawful traffic stop was unlawfully extended first must determine whether the officers diligently pursued the mission of the traffic stop during the entire period of detention. *See Hill*, 852 F.3d at 381-82. The court also must consider the length of time typically necessary to complete

12

such a traffic stop. If the officers did not detain the defendant longer than the time required to complete the mission of the traffic stop in a diligent manner, the inquiry ends, and the defendant has not been detained in violation of his Fourth Amendment rights. *See Rodriguez*, 575 U.S. at 354-55.

When, however, the defendant was detained longer than required to complete the mission of the stop, the court must determine whether the delay was effected for a particular purpose unrelated to the traffic stop. *Hill*, 852 F.3d at 381-82. And if so, the court must ascertain whether the officers had reasonable suspicion that the defendant had committed a crime to justify the prolonged stop and investigation. *See Rodriguez*, 575 U.S. at 355, 358; *Hill*, 852 F.3d at 381. Notably, the government bears the burden of justifying the length of a defendant's detention. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion) (explaining that the government has the burden of proving seizure was "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure"); *see also United States v. Palmer*, 820 F.3d 640, 654 (4th Cir. 2016) (explaining that the government bore the burden of establishing the reasonableness of the seizure).

We therefore remand this case to the district court to engage in the proper analysis in the first instance. Unless the district court in its discretion finds a compelling reason to consider additional evidence, the court's analysis of the issue whether the extension of the traffic stop resulted in an impermissible detention of Dadisman should be conducted based on the existing record. *See United States v. Fields*, 371 F.3d 910, 917 (7th Cir. 2004) (remanding to consider on record as established whether officers' initial entry into apartment was lawful); *United States v. Coward*, 296 F.3d 176, 180-83 (3d Cir. 2002)

13

(explaining relevant factors for considering whether to grant government's request to reopen the suppression hearing, including focusing on whether defendant would be prejudiced); *United States v. Kithcart*, 218 F.3d 213, 219 (3d Cir. 2000) (remanding for consideration on original suppression hearing evidence whether the officer had probable cause to seize a gun and explaining that court should be "extremely reluctant" to reopen the record).

## III.

For these reasons, we affirm the portion of the district court's judgment upholding the officer's limited search of the motorcycle for weapons. However, we vacate the district court's judgment regarding whether the duration of the traffic stop was lawful, as well as the sentence imposed by the court, and remand the case to the court for further proceedings consistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED WITH INSTRUCTIONS*