**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-4084

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JAMES JOSEPH PODBIELSKI,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Max O. Cogburn, Jr., District Judge. (1:20-cr-00066-MOC-WCM-1)

Argued:  March 22, 2023                           Decided:  August 1, 2023

Before DIAZ, Chief Judge, and GREGORY and THACKER, Circuit Judges.

Reversed, vacated, and remanded by unpublished per curiam opinion.

**ARGUED:** Ann Loraine Hester, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  Anthony Joseph Enright, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.  **ON BRIEF:**  John G. Baker, Federal Public Defender, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In the early hours of July 25, 2019, James Podbielski ("Appellant") was pulled over after Jackson County, North Carolina, Sherriff's Deputy Robert Porter ("Deputy Porter") observed Appellant's SUV cross the fog line twice and then cross left of center. After a 19-minute traffic stop, a K9 unit arrived on scene for a drug sniff. The K9 alerted, and officers searched Appellant's vehicle. Deputies located a plastic baggie containing approximately 1.4 ounces of methamphetamine and digital scales under the front passenger seat.

Appellant moved to suppress the drugs as well as his post-search statements, arguing that Deputy Porter improperly prolonged the stop without reasonable suspicion. The district court denied Appellant's motion. Subsequently, Appellant entered a conditional guilty plea to possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1), preserving his right to appeal the district court's denial of his motion to suppress.

We conclude that Deputy Porter prolonged the traffic stop without reasonable, articulable suspicion. Thus, we reverse the district court's denial of Appellant's suppression motion, vacate Appellant's conviction, and remand the case.

I.

A.

At approximately 2:45am on July 25, 2019, Deputy Porter was patrolling Highway 441 in uniform and in a marked vehicle. Highway 441 is "the most direct route from

2

Atlanta" and one of only two highways in the area of Whittier, North Carolina. J.A. 88.[1] While traveling behind a silver SUV, Deputy Porter observed the SUV cross over the fog line twice. Deputy Porter pulled alongside and passed the SUV in order to obtain its license plate number. In his rearview mirror, Deputy Porter observed the SUV cross over the center line. At that point, Deputy Porter "suspect[ed] the driver was possibly intoxicated or under the influence of something." *Id.* at 83.

During the suppression hearing, Deputy Porter testified that, in order to get the SUV to pass him so that he could initiate a traffic stop, he had to slow from 50 miles per hour to 35 miles per hour. Deputy Porter further testified, "it's pretty typical for vehicles to slow down to the posted speed limit or maybe five miles below, but it's very unusual -- I've never actually had a vehicle slow down this much." J.A. 84. Deputy Porter testified he found it suspect that Appellant would slow his vehicle so significantly below the posted speed limit. Once the SUV passed, Deputy Porter activated his blue lights and initiated a traffic stop at 2:46am. The stop occurred near Olivet Church Road in Whittier, North Carolina.

Deputy Porter informed Appellant, who was driving the SUV, that he had been stopped for crossing the fog and center lines. Although Deputy Porter initially suspected Appellant of driving under the influence, Deputy Porter testified that he did not smell alcohol. While speaking with Appellant, Deputy Porter noticed that the passenger's "pants were completely unzipped." J.A. 87. Deputy Porter became suspicious that the passenger,

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Anna Parton ("Parton"), was "possibly trying to conceal something within her pants or vaginal cavity." *Id*. Deputy Porter testified that he has encountered individuals during traffic stops who concealed drugs in their underwear or body cavities.

Deputy Porter was suspicious that drug trafficking was afoot because it was the middle of the night, the SUV was traveling "on Highway 441, which is the most direct route from Atlanta," and Appellant had a Georgia license plate. J.A. 88. Deputy Porter testified that, based on his experience and training, "Atlanta [is] commonly known as a major drug hub or distribution center for drugs coming into" the district. *Id.* Deputy Porter instructed Appellant to exit the vehicle. At that point, Deputy Levi Woodring ("Deputy Woodring") arrived. Although Deputy Porter testified that part of the reason he initiated the traffic stop was suspicion of Appellant driving under the influence, Deputy Porter did not ask Appellant to perform any sobriety tests.

Deputy Porter testified that neither Appellant nor Parton initially appeared more nervous than the average person during a traffic stop. However, according to Deputy Porter, once Appellant exited the vehicle, his "whole demeanor changed." J.A. 90. Appellant began fidgeting, shifting his feet from side to side, and would not stand still. Appellant's forehead also began to sweat even though it was "cool at that time" and in the "high 50s." *Id*.

Deputy Woodring called the driver's license numbers for both Appellant and Parton into a dispatcher. In the meantime, Deputy Porter asked Appellant "where he was going, where he was coming from, and how he knew" Parton. J.A. 91. During the suppression hearing, Deputy Porter was unable to recall where Appellant said he was coming from but

4

testified that Appellant stated he was headed to a cabin on Olivet Church Road. Appellant also informed Deputy Porter that he met Parton at "the casino" which Deputy Porter interpreted to be "Harrah's Cherokee" Casino and Resort ("Harrah's") in Cherokee, North Carolina. *Id.* at 91–92. Deputy Porter testified that Appellant's answers caused him to be suspicious because Deputy Porter "worked in security at the casino for five years, and [he knew] that a majority of the drugs that were located at the casino were transported from Atlanta, Georgia." *Id.* at 92. Appellant's SUV had a Georgia plate, but his driver license contained an address in Calhoun, Georgia, rather than Atlanta. Calhoun is located over an hour outside of Atlanta. Moreover, Deputy Porter admitted that Appellant "could not have come from Harrah's in the direction that [he] w[as] traveling." *Id.* at 136–37.

Deputy Porter then went to the passenger side of the car to speak with Parton. According to Deputy Porter, Parton became "a little more nervous," "wouldn't make eye contact with [him]," and began "looking inside the vehicle as if she was making sure something was hid[den]." J.A. 94. Deputy Porter acknowledged that it was normal for drivers or passengers to avoid eye contact. Nevertheless, Deputy Porter asserted that "[p]assengers normally aren't very nervous because they're not involved in any kind of violation or punishment that's going to be handed down from, like, a citation." *Id.* When asked how she knew Appellant and where the two were traveling, Parton provided responses consistent with Appellant's answers. When asked why her pants were unzipped, Parton said she had recently used the restroom and must have forgotten to zip her pants. Deputy Porter found this response suspicious because "at that time of the morning[,] there

5

is nowhere open to use the restroom." *Id*. at 95. However, Deputy Porter acknowledged that Parton could have used the restroom at a private residence.

After speaking with Parton, Deputy Porter again approached Appellant, asked whether there was anything illegal inside the SUV, and requested permission to search the vehicle. Appellant "became upset and angry," refused to consent to a search of the SUV, and stated that he "didn't want anyone looking inside his vehicle." J.A. 96–97. According to Deputy Porter, Appellant's change in tone led him to believe Appellant "was trying to conceal something within his vehicle." *Id.* at 96. Deputy Porter asserted that "most drivers" don't get upset when he asks if he can search their vehicle as "[m]ost people just want to know why I want to look in their vehicle." *Id.* at 97.

At 2:50am, dispatch informed Deputies Woodring and Porter that both Appellant and Parton's driver's licenses were suspended, and that Appellant had two outstanding criminal summonses in Jackson County, North Carolina. Neither Appellant nor Parton had any outstanding arrest warrants. At this time, "[Deputy] Porter suspected that illegal drugs may have been in the car and believed he had reasonable suspicion of illegal drug activity authorizing him to extend the traffic stop." Appellee Resp. Br. at 6. After speaking with Appellant and hearing back from dispatch, Deputy Porter contacted Senior Deputy Megan Rinehart ("Deputy Rinehart") and requested that she come to the scene with her K9 partner, a canine certified and trained to detect the odor of drugs.

While awaiting the K9 unit, Deputy Porter returned to his patrol vehicle and began preparing a citation for the offenses of driving without a license and crossing the fog line. The citation is a single-page document that merely required Deputy Porter to fill in blanks

6

and check boxes. Deputy Porter testified it took him five to ten minutes to prepare this citation. Then Deputy Porter "got on to the NCWR[2] system" and looked up Appellant's active criminal summonses. J.A. 102. According to Deputy Porter, he had to "find a new court date for [one of the summonses] because the original [court date] had already passed." *Id.* At 103. Next, Deputy Porter testified that "[d]ue to [Appellant] being with a local female," he "also ran [Appellant] through our database system . . . to ensure he didn't have any kind of child support purges[3] active or any kind of civil suit against him that needed to be served." *Id.* at 103–04. In this regard, Deputy Porter explained, "[A]s me being a county officer, we also do civil stuff. So we check to make sure that none of those need to be served." *Id.* at 146. According to Deputy Woodring, however, the normal procedure for a traffic stop does not include anything more than completing the single-page citation, which is a fill-in-the-blanks, check-the-boxes format, and checking for active warrants and summonses.

At approximately 3:05am -- 19 minutes after the traffic stop was initiated and 14 minutes after Deputy Porter began preparing the citation -- Deputy Rinehart and the K9 arrived on scene. Deputy Rinehart first approached Deputy Porter's vehicle without her dog. Deputy Porter informed her that he "suspected there to be illegal narcotics within the vehicle and [asked her] if she would run her dog." J.A. 148. Deputy Rinehart spoke with

---

[2] "NCWR" refers to North Carolina's statewide warrant repository.

[3] An individual may be found in contempt of a child support obligation. *See* N.C. Stat. § 50-13.4(f)(9). Thereafter, the individual may be required to "purge" himself or herself of the contempt. N.C. Stat. § 5A-21(a)–(b2).

Deputy Porter for approximately two minutes before returning to her vehicle to retrieve the K9.

According to Deputy Porter, when Deputy Rinehart began conducting the dog sniff, Deputy Porter "was finishing up [his] paperwork in [his] vehicle." J.A. 106. Deputy Rinehart testified that as she passed by Porter's car with the K9, Deputy Porter was "transmitting through his radio" as well as "looking stuff up on his computer through our system." *Id.* at 197. Deputy Rinehart explained that the dog sniff required her to take the dog around the car twice, once in each direction. Deputy Rinehart testified that "less than five minutes" passed between the time she retrieved the K9 from her vehicle and the time the dog completed two passes around the SUV. *Id.* at 199. It then took Deputy Rinehart "less than two minutes" to walk back to the car, put the dog in the vehicle, and walk back to Deputy Porter. *Id.* at 202.

According to Deputy Porter, while the dog sniff was being carried out, he approached Appellant and "informed him [of] the citations that [Deputy Porter] issued." J.A. 110–11. Deputy Porter "explained to [Appellant] why they were being issued to him and then what they entailed." *Id.* at 111. Deputy Porter "also explained to [Appellant] his court date" and, "since [Appellant] wasn't a local, . . . where the courthouse was located." *Id.* Then Deputy Porter read the two criminal summonses aloud to Appellant -- word for word. Deputy Porter testified, "[W]henever we serve a criminal summons on somebody[,] we have to read the offense in its entirety, and I informed him his court dates on that." *Id.* at 111. However, Deputy Woodring testified that the procedure for serving a criminal

8

summons is simply to print out the summons and give it to the person being cited. Deputy Porter took approximately five minutes to deliver the citation and summonses to Appellant.

Deputy Porter "was still explaining the citations and criminal summonses to [Appellant] as Deputy Rinehart was walking back to her vehicle" after the K9 sniff was complete. J.A. 112. Deputy Rinehart testified that, as she was returning the K9 to her vehicle, Deputy Porter "was still actively talking" to Appellant. *Id.* at 200. Deputy Rinehart did not tell Deputy Porter the result of the dog sniff at that time as her procedure is to "have my dog put in the car before I even have a conversation with the officer and let him know what's going on." *Id.* at 201.

Once Deputy Porter finished explaining the citations and reading the summonses in detail, word for word, to Appellant -- which was approximately 26 minutes after the traffic stop was initiated and 22 minutes after Deputy Porter first began preparing the citations -- Appellant asked, "Am I free to go?" J.A. 122. Deputy Porter informed Appellant that he could not leave because they "were going to have to wait to see if the K9 had alerted on his vehicle." *Id.* at 113–14. Porter then continued the stop for "roughly a minute" while "wait[ing] for Deputy Rinehart to come back to inform [them of] the result of the sniff." *Id.* at 114–15.

When Deputy Rinehart returned, she informed Deputy Porter that the dog had responded with a positive alert to the driver's side door seam. Deputies Porter and Woodring then searched the SUV and found a small plastic bag containing approximately 1.4 ounces of crystal methamphetamine and digital scales under the front passenger seat.

9

At approximately 3:29am, the deputies handcuffed Appellant and Parton, placed them in separate patrol vehicles, and called a tow truck for the car.[4]

Appellant informed Deputy Porter that he would like to speak to him. After being read his *Miranda* rights, Appellant claimed that "all the drugs were his and that [Parton] had no reason to go to jail." J.A. 117. The deputies then transported both Appellant and Parton to jail. During a strip search at the jail, officers located a container of pills concealed in Parton's vagina.[5]

B.

On August 4, 2020, a federal grand jury returned a one-count indictment against Appellant for possession with intent to distribute a quantity of methamphetamine in violation of 21 U.S.C. § 841(a)(1). Appellant subsequently filed a motion to suppress the evidence obtained from the search of the SUV, as well as his statements to law enforcement. Appellant argued that the traffic stop was unlawful because it had been "'prolonged beyond the time reasonably required to complete [the] mission' of issuing a warning ticket." J.A. 15 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). The

---

[4] Since neither Appellant nor Parton had a valid operating license, it is possible that officers would have inevitably found the drugs during an inventory search of the towed vehicle. *See United States v. George*, 971 F.2d 1113, 1121 (4th Cir. 1992). But it's the government's burden to prove the inevitable-discovery doctrine applies. *United States v. Edwards*, 666 F.3d 877, 887 (4th Cir. 2011). The government did not advance the argument before the district court or on appeal, so we will not consider it here. *Id.*

[5] Appellant admitted that the methamphetamine and scales were his, and the Government declined to charge Parton.

10

Government responded that "[t]he K9 sniff did not improperly extend the vehicle stop because it was completed prior to the completion of the vehicle stop." *Id.* at 41.

On May 13, 2021, the district court held a suppression hearing wherein Deputies Porter, Woodring, and Rinehart testified. Following the hearing, the district court denied Appellant's motion. Thereafter, Appellant entered a conditional guilty plea, preserving his right to appeal the district court's denial of the motion to suppress. Appellant timely noticed this appeal.

## II.

"[W]e review the factual findings underlying the district court's [denial of a] motion to suppress for clear error and its legal conclusions de novo." *United States v. Medley*, 34 F.4th 326, 332 (4th Cir. 2022). In doing so, we view "the evidence in the light most favorable to the government," the party that prevailed in the district court. *United States v. Abdallah*, 911 F.3d 201, 209 (4th Cir. 2018).

## III.

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures.'" *United States v. Black*, 707 F.3d 531, 537 (4th Cir. 2013) (alterations in original) (quoting U.S. Const. amend IV). "A traffic stop constitutes a 'seizure' under the Fourth Amendment and is thus subject to a reasonableness requirement." *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). Here, Appellant "does not challenge the initial traffic stop." J.A. 265. As a justified stop, Deputy Porter was permitted to ask Appellant to exit his vehicle, *see Maryland v. Wilson*, 519 U.S. 408, 412

11

(1997), and to "detain the offending vehicle for as long as it [took] to perform the traditional incidents of a routine traffic stop," *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008).

But "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2012). This allows officers to conduct "ordinary inquiries incident to" traffic stops, including "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (internal quotation marks omitted). And while the Fourth Amendment "tolerate[s] certain unrelated investigations that [do] not lengthen the roadside detention," the seizure becomes unlawful if unrelated inquiries "measurably extend the duration of the stop." *Id*. at 354–55 (internal quotation marks omitted). In other words, while an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop, . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. at 355 (internal citation omitted). A stop can also be extended if the driver consents. *See Williams*, 808 F.3d at 245. But here, the Government concedes Appellant did not consent to a search.

"A dog sniff around the vehicle's perimeter for the purpose of detecting narcotics 'is *not* an ordinary incident of a traffic stop.'" *United States v. Bowman*, 884 F.3d 200, 210 (4th Cir. 2018) (quoting *Rodriguez*, 575 U.S. at 355) (emphasis supplied). Therefore, if Deputy Porter did slow walk or prolong the stop to allow time for completing a dog sniff, he would have needed reasonable suspicion at the time the search was prolonged.

12

Appellant argues that Deputy Porter improperly prolonged the traffic stop both before and after the K9 completed its sniff. The district court concluded that "the use of the K9 in this case did not measurably extend the duration of the stop" because the dog sniff took place before Deputy Porter had completed the traffic stop and "Deputy Porter only took the amount of time reasonably required to complete the stop's mission." J.A. 269–71. The district court went on to hold, "Deputy Porter was entitled to find out the results of the dog sniff before letting [Appellant] go." *Id.* at 272. Notably, the district court did not cite any authority supporting this proposition. Appellant argues that Deputy Porter improperly prolonged the traffic stop both before and after the K9 completed its sniff.

On appeal, the Government does not deny that Deputy Porter prolonged the stop. Rather, the Government asserts, "The Fourth Amendment authorized Deputy Porter to prolong the stop to investigate further with the help of a trained drug dog." Appellee Resp. Br. at 22; *see also*, Oral Argument at 15:09–15:16, *United States v. Podbielski*, No. 22-4084 (4th Cir. March 22, 2023), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments [hereinafter "Oral Argument"] ("If there is no reasonable suspicion, then we lose."). The Government claims that Deputy Porter was "authorized . . . to extend the stop to investigate further with the assistance of a trained drug dog because, when [Deputy Porter] called for that assistance, he had reasonable suspicion that illegal drug crime may be afoot." Appellee Resp. Br. 20.

### A.

While the Government concedes that Deputy Porter prolonged the stop, we begin there to explain why the concession is well taken. We have held that officers must

13

"execute[] their tasks with reasonable diligence," and may not prolong the stop "for purposes beyond the mission of the stop." *United States v. Hill*, 852 F.3d 377, 383 (4th Cir. 2017). "The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision." *Branch*, 537 F.3d at 336. Rather, we conduct a contextual review to determine "whether the detention lasted longer than was necessary, given its purpose." *Id.*

In *Hill*, we explained that "an officer's decision to execute a traffic stop in a deliberately slow or inefficient manner, in order to expand a criminal investigation within the temporal confines of the stop without reasonable suspicion" could compel a conclusion that the officer has violated the Fourth Amendment. 852 F.3d at 384. Here, several actions taken by Deputy Porter were outside the "mission of the [subject] stop" and without reasonable suspicion. *Id.* at 383.

First, Deputy Porter readily concedes that during the traffic stop, he accessed the Jackson County court calendar, obtained a new date of appearance, and modified one of Appellant's active criminal summonses. Appellant asserts that Deputy Porter's action in modifying the summons not only delayed the stop, but it also violated North Carolina General Statute § 15A-301.1(d), which provides, "Any criminal process in the Electronic Repository shall be a part of the official records of the clerk of the superior court of the county for which it was issued and shall be maintained in the office of that clerk." Specifically, Appellant argues that while law enforcement officers are authorized to print and serve criminal summons and enter tracking information, they are not authorized to alter electronic criminal processes. *Id.* at §§ 15A-301.1(e), (g). The Government offers no

14

argument to the contrary, nor does it attempt to defend Deputy Porter's actions in slow walking this process.

Second, Deputy Porter searched for unrelated civil summonses, including any contempt orders for failure to meet child support obligations. But the purpose of a traffic stop is to "ensur[e] that vehicles on the road are operated safely and responsibly." *Rodriguez*, 575 U.S. at 355. While a check for outstanding criminal warrants "serve[s] the same objective" by helping the officer "determine whether the apparent traffic violator is wanted for one or more previous traffic offenses," a check for outstanding *civil* obligations lacks "the same close connection to roadway safety." *Id*. Though Deputy Porter testified these checks were justified "[d]ue to [Appellant] being with a local female," J.A. 103–04, it is unclear why the presence of a "local female" necessitates this additional, time-consuming research. The Government offers no explanation for this, and we certainly have not held that an officer can prolong a stop to investigate potential child support obligations simply because a female passenger is present in the vehicle with a male driver. If the driver were female with a male passenger, would Deputy Porter still use this reasoning as a purported excuse to prolong the traffic stop? Doubtful.

Third, even though North Carolina law does not require it (and his fellow officer disavowed that it was standard procedure), Deputy Porter read Appellant's criminal summonses and the traffic citation to Appellant -- word for word. *See* N.C. Gen. Stat. § 15A-301(c)(1) ("Upon execution or service, a copy of the process must be delivered to the person arrested or served."). We do not suggest that an officer always offers information to a motorist at his peril. But Deputy Porter's decision here to (1) dedicate an

15

additional five minutes to painstakingly read and explain the documents and (2) take more time to tell Appellant where the courthouse was located, informs the Fourth Amendment analysis.

Fourth, Deputy Porter further extended the stop when he paused his ticket-writing duties to speak with Deputy Rinehart about the K9 search. *Rodriguez*, 575 U.S. at 357. While the conversation lasted "[l]ess than two minutes," even a de minimis delay can violate the Fourth Amendment. *See Williams*, 808 F.3d at 246–47; *see also id.* at 247 ("nearly three-minute extension" of stop to conduct a dog sniff required reasonable suspicion or consent).

The district court acknowledged that that Deputy Rinehart "checked in with Deputy Porter to see what he had" when she arrived at the scene, J.A. 269, but excused the delay because "the dog sniff took place, in its entirety, before Deputy Porter completed the stop," J.A. 272. But it does not follow that an officer can detour from his traffic-stop tasks to orchestrate a dog sniff so long as the sniff concludes before he finishes the stop. Indeed, the "critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket," but whether the sniff "adds time to the stop." *Rodriguez*, 575 U.S. at 357. Here, the sniff added—at a minimum—the time it took Deputy Porter to brief Deputy Rinehart.

Finally, Deputy Porter prolonged the stop when he finished issuing the citation but required Appellant to wait for the results of the dog sniff. It is undisputed that the traffic stop was over when Appellant asked to leave, but Rinehart took "roughly a minute" to put the dog back and report the positive alert to Porter. J.A. 115. A faithful reading of *Rodriguez* suggests that this extra time also "add[ed] time to" the stop. *See* 575 U.S. at

16

357. The district court found (without citing any authority) that this delay did not count because "Porter was entitled to find out the results of the dog sniff before letting Defendant go." J.A. 272. But there is no limiting principle to this notion. Could an officer, without reasonable suspicion or consent, detain a subject roadside for an hour while awaiting the results of another investigation? *Rodriguez*'s answer is no.

Considering all of the above, there is no doubt that Deputy Porter prolonged this traffic stop.

## B.

The Government's sole argument on appeal is that "[t]he Fourth Amendment authorized Deputy Porter to extend the stop to allow Deputy Rinehart and [the K9] to conduct a dog sniff because he had a 'reasonable, articulable suspicion of ongoing criminal activity' under the 'standard articulated in *Terry v. Ohio*, 392 U.S. 1 (1968).'" Appellee Resp. Br. 24 (quoting *United States v. Palmer*, 820 F.3d 640, 648–50 (4th Cir. 2016)).

To establish reasonable suspicion, "a police officer must simply point to specific and articulable facts which, taken together with rational inferences from those facts, . . . evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Branch*, 537 F.3d at 336 (internal citation and quotation marks omitted)). "[T]he level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020).

In evaluating reasonable suspicion, we look "at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for

17

suspecting legal wrongdoing." *Williams*, 808 F.3d at 246 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). We must "separately address each of" the officer's asserted factors "before evaluating them together with the other circumstances of the traffic stop." *Bowman*, 884 F.3d at 214 (quoting *United States v. Powell*, 666 F.3d 180, 187–88 (4th Cir. 2011)). The detaining officer must be able "to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *Williams*, 808 F.3d at 246 (quoting *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011)). And, critically, the facts provided must "serve to eliminate a substantial portion of innocent travelers." *Id.* (quoting *United States v. McCoy*, 513 F.3d 405, 413 (4th Cir. 2008)).

Here, the Government identifies several factors it claims provided Deputy Porter with reasonable suspicion of criminal activity. We address each in turn and then consider their cumulative effect. Even viewing the evidence in the light most favorable to the Government, we conclude that Deputy Porter lacked reasonable suspicion to prolong the traffic stop.

1.

a.

The Government points first to the fact that, prior to the stop, Appellant slowed his vehicle "in an effort to evade Deputy Porter's effort to maneuver his car behind [Appellant's]." Appellee Resp. Br. at 26. We have noted that "evasive reactions to the presence of police may be considered in determining whether reasonable suspicion exists

18

for an investigatory stop." *United States v. Smith*, 396 F.3d 579, 584 (4th Cir. 2005).[6]

Here, Deputy Porter testified that Appellant slowing down to avoid passing a police officer, coupled with crossing the center and fog lines, made him suspect that Appellant was possibly intoxicated. Yet, upon initiating the traffic stop, Deputy Porter did not detect the odor of alcohol or conduct any sobriety tests. Standing alone then, Appellant's deceleration fails to supply reasonable suspicion to extend the stop.

b.

Second, the Government relies on Deputy Porter's assertion that Parton was "look[ing] inside the vehicle as if making sure something was hidden." Appellee Resp. Br. at 27 (citing J.A. 94, 100). Deputy Porter testified that Parton's conduct was unusual, particularly for a passenger.

Appellant argues that as a Native American woman, Parton was likely avoiding eye contact as a sign of respect, and Porter's interpretation to the contrary demonstrates implicit bias. Appellant Opening Br. at 46–47. *See Drakeford*, 992 F.3d at 267 (Wynn, J., concurring) (criticizing deference to officers' "training and experience" to establish reasonable suspicion, as "one behavioral effect of implicit bias is that it influences how individuals interpret the ambiguous behaviors of others" (quoting L. Song Richardson,

---

[6] At least one of our sister circuits has cautioned that "a driver's preoccupation with a police vehicle following him is a quite natural reaction and was held to be insufficient to justify an investigatory stop." *United States v. Jimenez-Medina*, 173 F.3d 752, 755 (9th Cir. 1999) (quotation marks omitted); *see also Clinton v. Garrett*, 551 F. Supp. 3d 929, 944 (S.D. Iowa 2021) ("[A] nervous reaction to police presence, without more, is insufficient to generate reasonable suspicion.").

19

*Police Efficiency and the Fourth Amendment*, 87 Ind. L.J. 1143, 1148 (2012) (alteration omitted)). But the record here does not suggest that Deputy Porter viewed Parton's lack of eye contact as grounds for reasonable suspicion.[7] Rather, it was Parton's eye movements in "looking inside the vehicle as if she was making sure something was hid[den]" that Deputy Porter testified he found suspicious. J.A. 94.

Thus, this factor tilts in Deputy Porter's favor.

c.

The Government next relies on Deputy Porter's observation that Parton's pants were "completely unzipped" as a basis for reasonable suspicion of drug trafficking. J.A. 87. Deputy Porter asserts that based on his experience, this suggested Parton was concealing drugs in her underwear or body cavity. Deputy Porter testified that he found Parton's explanation for her unzipped pants -- that she had used the restroom and must have forgotten to zip them -- suspicious because, "at that time of the morning there is nowhere open to use the restroom." *Id.* at 95. While it is within the realm of possibility that Parton used the restroom at a private residence or even by the roadside, an officer "need not rule out the possibility of innocent conduct." *Glover*, 140 S. Ct. at 1188 (quoting *Navarette v. California*, 572 U.S. 393, 403 (2014)).

But this basis for reasonable suspicion -- and much of Deputy Porter's other testimony pertaining to his purported experience and training -- could not have been relied

---

[7] Indeed, we have held "[t]here is nothing intrinsically suspicious or nefarious about the occupant of a vehicle not making eye contact with an officer during a traffic stop." *Bowman*, 884 F.3d at 215.

20

upon by Deputy Porter *at the time* of the traffic stop because it rests upon experience purportedly gleaned by Deputy Porter in the two years *after* Appellant was stopped by Deputy Porter.

The suppression hearing in this case occurred two years after the traffic stop at issue. At the time Deputy Porter testified at the suppression hearing, he had been working as a law enforcement officer for almost five years, with the first six months spent working as a bailiff. This means that, at the time Deputy Porter initiated the traffic stop in of Appellant, he had only been working as a patrol deputy for approximately two and a half years. Yet during the suppression hearing, Deputy Porter failed to anchor his testimony on his experience *at the time of the stop*, as opposed to *at the time of the hearing*. *See* J.A. 88 (Q: "And *had you* encountered individuals during past stops, male or female, where they had concealed drugs on their person, such as in their underwear?" A: "Yes, sir, *I sure have*") (emphasis supplied); *see also id.* at 89 ("And *had you* ever previously encountered a female who had concealed drugs insider her vagina?" A: "Yes, sir, *I sure have*") (emphasis supplied). Therefore, it is impossible to tell from Deputy Porter's testimony whether he had the requisite experience to justify reasonable suspicion at the time of the traffic stop.

d.

The Government also points to the change in Appellant's demeanor when Deputy Porter asked to search the SUV as supplying reasonable suspicion to prolong the stop. First and foremost, Appellant had a constitutional right not to consent to a search and asserting that right must not be held against him as a basis for reasonable suspicion. *See United States v. Massenburg*, 654 F.3d 480, 491 (4th Cir. 2011) ("If the ordinary response of the

21

innocent upon being asked to consent to a search . . . sufficed to create reasonable suspicion, then *Terry*'s reasonable suspicion requirement would become meaningless: officers could ask a citizen for permission to conduct a voluntary search, and, if denied, they could use the citizen's denial as evidence of criminal activity and perform the search anyway.").

As to Appellant's nervous demeanor, nervousness itself is "not a particularly good indicator of criminal activity, because most everyone is nervous when interacting with the police." *Bowman*, 884 F.3d at 214 (internal quotation marks omitted). However, Deputy Porter testified that Appellant exhibited "signs of nervousness above the norm," *id.*, including sweating when the weather was cool, shifting feet from side to side, and becoming upset in response to questions about whether his car contained anything illegal. And we have previously held that "sweating profusely on a cold day, hands shaking, . . . and increased agitation when asked routine questions" are indicative of "exceptional nervousness" contributing to reasonable suspicion. *United States v. Foreman*, 369 F.3d 776, 785 (4th Cir. 2004) (citation omitted). While it is possible that Appellant was simply nervous because he had been asked for his driver's license -- which was suspended -- we credit Deputy Porter's assessment that Appellant was exceptionally nervousness and that this observation was indicative of criminal activity.

e.

Finally, the Government cobbles together an assortment of additional facts as asserted bases for reasonable suspicion, such as Appellant driving in the early morning on Highway 441, which Deputy Porter testified is the most direct route from Atlanta (a major

22

source for drugs); having a Georgia license plate and registration; and traveling with a local passenger.[8]

Of note, Highway 441 is one of only two highways in the area. And in *Williams*, we rejected the notion that traveling "on a known drug corridor at 12:37 a.m." could contribute to reasonable suspicion given that "the number of persons using the interstate highways as drug corridors pales in comparison to the number of innocent travelers on those roads," and "we [were] not persuaded by the proposition that traveling south on I-85 late at night helps narrow the identification of travelers to those involved in drug activity." 808 F.3d at 247. As we held in *Williams*, "it is far from self-evident that interstate trafficking of drugs or other contraband is more common at night." *Id.* at 249. Thus, absent evidence that "drug traffickers have some disproportionate tendency" to travel on Highway 441 "late at night," this factor does not support reasonable suspicion. *Id.* at 248.

Further, Appellant simply driving a vehicle with a Georgia license plate and registered to a Georgia citizen is not a basis to provide Deputy Porter with reasonable suspicion of drug trafficking. Citing *United States v. Villavicencio*, 825 F. App'x 88, 97–98 (4th Cir. 2020), the Government argues that Georgia is "a source state for narcotics" to

---

[8] The Government also now claims that the fact that Appellant and Parton met at Harrah's casino, a "location that [Deputy Porter] knew had a connection with drugs imported from Georgia," Appellee Resp. Br. at 33 (citing J.A. 91–92), contributed to Deputy Porter's reasonable suspicion of drug trafficking. Significantly, however, when Deputy Porter testified during the suppression hearing as to which factors caused him "to call in the K9 in this case," this fact was not mentioned. J.A. 100. And "[i]t is 'the *police officer*' who 'must be able to point to specific and articulable facts'—not a party's brief." *United States v. Peters*, 60 F.4th 855, 864 (4th Cir. 2023) (quoting *Terry*, 392 U.S. at 21) (emphasis in original). Thus, this late-breaking rationale does not hold weight.

which Highway 441 was connected providing some indicia of reasonable suspicion. First, *Villavicencio* is unpublished and, therefore, not precedential. Beyond that, Deputy Porter himself could not recall from where Appellant was traveling. *See* J.A. 91 ("I don't recall where [Appellant] told me he was coming from."). So while Appellant had a Georgia registration, he may not have been coming from Georgia at the time of the stop. At bottom, simply having a Georgia license plate and registration does nothing to "eliminate a substantial portion of innocent travelers," and thus does not provide reasonable suspicion. *Williams*, 808 F.3d at 246.

Additionally, Deputy Porter failed to provide any explanation for how or why the presence of a "local female" provides reasonable suspicion of drug trafficking. Surely males and females traveling together would include a "substantial portion of innocent travelers." *Id*.

2.

Having reviewed each fact individually, we next consider the totality of the circumstances, as reasonable suspicion "may well 'exist even if each fact standing alone is susceptible to an innocent explanation.'" *Palmer*, 820 F.3d at 652 (quoting *McCoy*, 513 F.3d at 413–14).

Once we eliminate the facts that are reasonably attributable to innocent travelers, or are improper for consideration, we are left with very little. What remains is Appellant's nervousness after being pulled over while driving on a suspended license and Parton's unzipped pants. This is countered by Deputy Porter's failure to account for potentially innocent explanations (such as Parton having just gone to the bathroom), or facts that might

24

dispel reasonable suspicion (such as the consistent responses provided by Appellant and Parton about where they were headed). *See Drakeford*, 992 F.3d at 263 (stating that, when reviewing the totality of the circumstances, we include "the presence of additional facts [that] might dispel reasonable suspicion"). Therefore, we conclude that Deputy Porter did not possess reasonable suspicion of drug trafficking in order to prolong the search.

In essence, what remains is nothing more than a "hunch" on the part of Deputy Porter. And this is not enough to overcome the protection of the Fourth Amendment. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) (reasonable suspicion requires the government to "articulate something more than an inchoate and unparticularized suspicion or hunch" (internal quotation marks omitted)). Rather, the record suggests that when Deputy Porter -- with experience working at Harrah's -- heard Appellant and Parton met at the casino, he immediately viewed them as drug dealers. As we admonished in *Drakeford*, "The Fourth Amendment does not allow the Government to label a person as a drug dealer and then view all of their actions through that lens." 992 F.3d at 264.

Ultimately considering the totality of the circumstances, we conclude that Deputy Porter lacked reasonable suspicion. And as the Government has conceded, "If there is no reasonable suspicion, then we lose." Oral Argument at 15:09–15:16.

### IV.

Appellant's conviction is vacated and the district court's denial of Appellant's motion to suppress is reversed and remanded.

*REVERSED, VACATED, AND REMANDED*

25